UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

BCC MERCHANT SOLUTIONS, INC.,  §
§
     Plaintiff,  §
§
v.  §    CIVIL ACTION NO. 3:12-CV-5185-B
§
JET PAY, LLC, TRENT R. VOIGT, and  §
MERRICK BANK CORPORATION,  §
§
     Defendants.  §

## MEMORANDUM OPINION AND ORDER

Before the Court is Merrick Bank Corporation's Rule 12(b)(6) Motion to Dismiss (doc. 40),

filed October 28, 2013. Upon consideration of the Motion, the Court finds that it should be and

hereby is **GRANTED in part and DENIED in part**.

## I.

## BACKGROUND

Plaintiff BCC Merchant Solutions, Inc., ("BCC") provides payment solutions, including the

ability to accept payments via credit cards, debit cards, and charge cards ("card transactions") to

retail and commercial merchant customers. Doc. 31, Sec. Am. Compl. ¶ 8. BCC is also a registered

Independent Sales Organization/Member Service Provider ("ISO/MSP"). *Id.* ¶ 9. An ISO/MSP

provides services on behalf of a "Sponsoring Member Bank" such as Defendant Merrick Bank

Corporation ("Merrick"). *Id.* ¶ 9 n.2. BCC alleges that, on or about November 10, 2008, BCC and

Merrick entered into a written contract, a Merchant ISO Agreement ("ISO Agreement"), in which

BCC agreed to market and promote Merrick's services. *Id.* ¶ 13. Under the ISO Agreement, BCC

would assist merchants interested in obtaining Merrick's banking services by helping them submit an application for Merrick's approval. *Id.* Following approval of a merchant's application, Merrick, BCC, and the merchant would enter into a Merchant Agreement. *Id.* The "Merchant Agreement" governed the business relationship between Merrick, BCC, and the merchant, in connection with services that Merrick and other third-party service providers would provide for settling the merchant's sales transactions. *Id.* BCC alleges that under the ISO Agreement, BCC's right to select third-party service providers was limited to the five entities approved and listed by Merrick on Schedule C of the ISO Agreement. *Id.* ¶ 14. Among those five entities were Cardworks Processing, Inc. ("CardWorks"), TSYS Acquiring Solution ("TSYS"), and Defendant JetPay, LLC ("JetPay"). *Id.*

BCC alleges that upon entering into the ISO Agreement with Merrick on November 10, 2008, it selected CardWorks and TSYS as third-party service providers for its merchant customers. *Id.* ¶ 16. However, in late 2011, CardWorks, Inc., parent to Merrick Bank and CardWorks Processing, closed the CardWorks Processing platform. *Id.* ¶ 17. Consequently, BCC had to choose a new third-party service provider. *Id.* BCC allegedly made an inquiry to Merrick regarding the capabilities of another Schedule C-approved third-party service provider, JetPay. *Id.* Purportedly, an unnamed Merrick Bank officer "assured an officer of BCC that JetPay was a qualified, skilled processor and that its transaction settlement platform was reliable." *Id.* BCC alleges that "as a direct and proximate result of Merrick Bank's misrepresentations," BCC entered into an agreement with JetPay effective January 31, 2012, for JetPay to perform debit card, charge card, and credit card transaction processing and related service for BCC. *Id.* ¶ 21. BCC experienced a multitude of problems with JetPay's services, and consequently suffered damages in the form of lost goodwill, lost

customers, lost profits, and other costs that proved necessary to mitigate and substitute for JetPay's failure to properly perform. *Id.* ¶ ¶ 30-31, 35, 42, 43. Additionally, BCC alleges that Merrick wrongfully made payments to BCC's merchants in the amount of $365,000 and wrongfully "withheld and deducted that sum from monies [Merrick] owed to BCC." *Id.* ¶ 38. BCC also alleges that "[u]pon learning of the contract dispute between Jet Pay and BCC and Jet Pay's wrongful demands for payments, Merrick Bank wrongfully converted One Hundred Thousand Dollars ($100,000.00)" from residual payments owed to BCC, and paid that sum to JetPay. *Id.* ¶ 39. Altogether, BCC alleges that it has suffered damages in excess of $2 million due to Merrick and JetPay's respective breaches of their agreements with BCC. *Id.* ¶¶ 38-43.

On December 19, 2012, BCC filed its Original Complaint in this Court. Doc. 1, Orig. Compl. On September 6, 2013, BCC amended its Complaint to join Merrick as a defendant. The Second Amended Complaint asserted claims against Merrick for breach of contract, negligent misrepresentation, fraud by non-disclosure, and conversion. Doc. 31, Sec. Am. Compl. ¶¶ 44-60. On October 28, 2013, Merrick filed its Motion to Dismiss all claims, which is now ripe for review. Doc. 40, Def.'s Br.

## II.

## LEGAL STANDARD

A.      *Rule 12(b)(6)*

Under the Federal Rules of Civil Procedure, a complaint must contain "a short, plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A plaintiff may support his claim for relief with any set of facts consistent with the allegations in the complaint. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007). Rule 12(b)(6) authorizes dismissal

of a complaint that fails to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). In analyzing a Rule 12(b)(6) motion, the Court "accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). Such a motion should only be granted when the complaint does not include "enough facts to state a clam to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009). "The plausibility standard is not akin to a 'probability requirement,' but asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Thus, to survive a motion to dismiss, "factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. A complaint that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

A court may "rely on 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)). Additionally, a court may review those documents attached to a defendant's motion to dismiss to the extent that those documents are referred to in the complaint and are central to the claims. *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004).

B.      *Rule 9(b)*

A dismissal for failure to plead with particularity in accordance with Rule 9(b) is treated as a Rule 12(b)(6) dismissal for failure to state a claim. *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996). Rule 9(b) provides, in pertinent part, that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). When claims for fraud and negligent misrepresentation are based on the same set of alleged facts, Rule 9(b)'s heightened pleading standard applies. *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 n.3 (5th Cir. 2010); *see Paul v. Aviva Life & Annuity Co.*, No. 3:09-CV-1490-B, 2010 WL 5105925, at *8 (N.D. Tex. Dec. 14, 2010) (applying 9(b) to fraud and negligent misrepresentation claims that arose out of same set of facts but were contained in separate counts in complaint). In the Fifth Circuit, the Rule 9(b) standard requires "specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation of why they were fraudulent." *Plotkin v. IP Axess, Inc.*, 407 F.3d 690, 696 (5th Cir. 2005); *see also Southland Secs. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004). In other words, the complaint must provide "the essentials of the first paragraph of any newspaper story, namely the who, what, when, where, and how." *Melder v. Morris*, 27 F.3d 1097, 1100 n.5 (5th Cir. 1994).

C.      *Rule 15(a)(2)*

"It is settled that the grant of leave to amend the pleadings pursuant to Rule 15(a) is within the discretion of the trial court." *Zenith Radio Corp. v. Hazeltine Research Inc.*, 401 U.S. 321, 330 (1971). Leave should be freely given "when justice so requires." FED. R. CIV. P. 15(a)(2). However, granting leave to amend "is by no means automatic." *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139

(5th Cir.1993). The district court may consider such factors as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment." *Inline Corp. v. Tricon Restaurants Int'l*, No. 3:00-CV-0990, 2002 WL 1331885, at *1 (N.D.Tex. June 14, 2002) (citing *Wimm*, 3 F.3d at 139).

## III.

## ANALYSIS

Merrick moves to dismiss BCC's claims for breach of contract, negligent misrepresentation, fraud by non-disclosure, and conversion. BCC opposes dismissal as to each claim. The Court considers the parties' arguments as to each claim, in turn, below.

A.      *BCC's Breach of Contract Claims*

The parties agree that the ISO Agreement, the underlying contract here, is "governed by and construed in accordance with the law of the State of Utah." Docs. 40, Def.'s Br. 7-8; 48, Pl.'s Resp. 11. Under Utah state law, a *prima facie* case for breach of contract consists of four elements: "(1) a contract, (2) performance by the party seeking recovery, (3) breach of contract by the other party, and (4) damages." *Bair v. Axiom Design, L.L.C.*, 20 P.3d 388, 392 (Utah 2001) (citing *Nuttall v. Berntson*, 30 P.2d 738, 741 (Utah 1934)). The parties do not dispute that there was a contract, that BCC performed under the contract, or that BCC suffered damages. The parties only disagree as to whether a breach of contract occurred.

Although BCC's Complaint fails to specify what provisions of the contract Merrick breached, the Court can discern three distinct grounds upon which BCC bases its breach of contract claims: (1) Merrick breached the ISO Agreement when it misrepresented JetPay's capabilities and thus failed

to fulfill its obligations under the Agreement to assist BCC in locating a reasonably acceptable third-party service provider; (2) Merrick breached the ISO and Merchant Agreements by wrongfully withholding and making payments to BCC's merchants from monies owed to BCC; and (3) Merrick breached the ISO Agreement when it wrongfully withheld residual payments owed to BCC and instead paid those sums to JetPay. *See* Docs. 31, Sec. Am. Compl. ¶¶ 14-21, 30-33, 38-39; 48, Pl. Resp. 14-23. The Court concludes that the first and third grounds alleged are sufficiently pled so as to make out breach of contract claims. The Court reaches the opposite conclusion as to the second grounds presented by BCC. The Court will address each of these three breach of contract claims separately below.

As an initial matter, however, the Court must first address Merrick's argument that BCC's failure to reference specific contractual provisions that Merrick allegedly breached in its Complaint undermines each of its breach of contract claims. Doc. 40, Def.'s Br. 8. BCC responds by arguing that the detailed factual allegations at the beginning of its Complaint are more than sufficient to make out each of its breach of contract claims against Merrick. Doc. 48, Pl.'s Resp. 11-13. Although BCC insists that it is not required to specify which particular provisions Merrick allegedly breached in order to make out its contractual claims, BCC lists multiple provisions of the ISO and Merchant Agreement that Merrick allegedly breach given the actions alleged in the Complaint.[1] *Id.*

The Court concludes that there is no requirement that BCC identify any specific provision

---

[1] Regarding the ISO Agreement, BCC implicates "by example and not limitation: 1.2; 1.3; 3.1; 3.2; 4.11; 4.12; 5.2(b),(b)[sic],(d),(e), (f), (g), and (j); 7.4; 8.1(c); 13.5; Schedule L." Doc. 48, Pl.'s Resp. 13. Regarding the Merchant Agreement, BCC implicates Sections 1.15, 2.1, and 3. *Id.* However, BCC's arguments principally rely upon Sections 1.3, 2.1, 2.3, and 5.2(b) of the ISO Agreement and Sections 1.15 and 2.1 of the Merchant Agreement. *Id.* at 14, 16, 21-22.

of the underlying agreements in order to survive a Rule 12(b)(6) motion. *Ricupito v. Indianapolis Life Ins. Co.*, No. 3:09-CV-2389-B, 2010 WL 3855293, at *6 (N.D. Tex. Sep. 30, 2010). Moreover, the Court may review the ISO Agreement and Merchant Agreement referenced in the pleadings in order to gain a better understanding of the context for each of the cited provisions. *See Dorsey*, 540 F.3d at 338.

> 1.   Misrepresentation and Failure to Disclose Information Regarding JetPay

Even though it is unclear whether certain provisions within the contract shield Merrick from liability for any representations that it made as to the suitability of JetPay as a third-party service provider, BCC's allegations that Merrick withheld information regarding JetPay's qualifications are sufficient to state a claim that Merrick breached its obligations under the ISO Agreement to assist BCC in locating an acceptable provider.

Merrick had a duty to assist BCC in locating a reasonably acceptable third-party service provider by the express terms of the contract. Section 5.2(b) of the ISO Agreement states

> Merrick will do the following during the term of this Agreement:

> b.   Assist [BCC] with locating Third Party Service providers reasonably acceptable to [BCC]

Doc. 41, ISO Agreement Ex. A. In an attempt to locate such a third-party service provider, BCC inquired with Merrick regarding the capabilities of JetPay. Doc. 31, Sec. Am. Compl. ¶ 17. In response, a Merrick officer allegedly assured BCC of JetPay's qualifications as a skilled and reliable processor. *Id.* At the same time, however, BCC alleges that Merrick withheld knowledge that JetPay lacked the capability to competently and timely deliver the merchant processing services sought by BCC. *Id.* ¶¶ 18-20. Specifically, BCC alleges that Merrick held an internal review of JetPay and

knew of JetPay's systemic problems prior to BCC's inquiry. *Id.* ¶ 20. Despite this purported knowledge of JetPay's inadequacies, Merrick assured BCC of JetPay's qualifications and otherwise withheld information as to JetPay's fitness as a third-party service provider. *Id.* ¶ 17.

These allegations would seemingly be sufficient to show that Merrick breached its duty to "[a]ssist [BCC] with locating Third Party Service providers reasonably acceptable to [BCC]," however, Merrick contends that the plain language of the ISO Agreement precludes BCC from recovering because Section 1.3 of the ISO Agreement makes clear that Merrick made "no representations or warranties of fitness or performance" as to JetPay and also disclaimed any liability for the acts or omissions of JetPay. Doc. 40, Def.'s Br. 8-10; 51, Def.'s Reply 3-5. BCC disputes this interpretation of the contract, insisting instead that when harmonized with other provisions of the contract, Section 1.3 only relieved Merrick of liability after it had fulfilled its duty to assist BCC in locating a reasonably acceptable third-party service provider. Doc. 48, Pl.'s Resp. 14-17.

Under Utah law, the Court must look "to the language of the contract to determine its meaning and the intent of the parties." *Café Rio, Inc. v. Larkin–Gifford–Overton, LLC*, 207 P.3d 1235, 1240 (Utah 2009). In doing so, Utah courts "consider each contract provision . . . in relation to all of the others, with a view toward giving effect to all and ignoring none." *Green River Canal Co. v. Thayn*, 84 P.3d 1134, 1141 (Utah 2003) (ellipses in original). "Seeming contradictions must be harmonized if that course is reasonably possible." *QEP Energy Co. v. Sullivan*, 444 F. App'x 284, 292 (10th Cir. 2011) (internal quotation marks omitted) (quoting *Vitagraph, Inc. v. Am. Theatre Co.*, 291 P. 303, 306 (Utah 1930)). Accordingly, "[a] construction which entirely neutralizes one provision should not be adopted if the contract is susceptible of another which gives effect to all of its provisions." *Id.*

"Where the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Café Rio*, 207 P.3d at 1240 (citing *Green River Canal Co.*, 84 P.3d at 1141) (internal quotation marks omitted). Only when "the language of the contract is ambiguous will [Utah courts] consider extrinsic evidence of the parties' intent." *Café Rio*, 207 P.3d at 1240 (citing *Deep Creek Ranch, LLC v. Utah State Armory Bd.*, 178 P.3d 886 (Utah 2008)). Utah courts "have explained that 'ambiguity exists in a contract term or provision if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies.'" *Café Rio*, 207 P.3d at 1240 (quoting *WebBank v. Am. Gen. Annuity Serv. Corp.*, 54 P.3d 1139, 1145 (Utah 2002)).

Contractual ambiguity may arise in two contexts: "(1) facial ambiguity with regard to the language of the contract and (2) ambiguity with regard to the intent of the contracting parties." *Daines v. Vincent*, 190 P.3d 1269, 1275-76 (Utah 2008) (citing *Ward v. Intermountain Farmers Ass'n*, 907 P.2d 264, 268 (Utah 1995)). "The first context presents a question of law to be determined by the judge." *Id.* at 1276 (citing *WebBank*, 54 P.3d at 1139). On the other hand, "[t]he second context presents a question of fact where, if the judge determines that the contract is facially ambiguous, 'parol evidence of the parties' intentions should be admitted.'" *Daines*, 190 P.3d at 1276 (quoting *Winegar v. Froerer*, 813 P.2d 104, 108 (Utah 1991)). The determination of contractual ambiguity "begins with an analysis of facial ambiguity." *Daines*, 190 P.3d at 1276.

In assessing facial ambiguity, Utah courts consider any relevant and credible evidence. *Daines*, 190 P.3d at 1276. Utah courts have found ambiguity in a contract taken as a whole. *Id.* at 1277 (citing *WebBank*, 54 P.3d at 1139). However a consideration of relevant, credible evidence

"does not create a preference for that evidence over the language of the contract." *Id.* at 1276. Thus, after consideration of the relevant and credible evidence regarding the parties' contrary interpretations, "the judge must ensure that 'the interpretations contended for are reasonably supported by the language of the contract.'" *Id.* (quoting *Ward*, 907 P.2d at 268). "When the contract language is not susceptible to contrary interpretations, the contract is not ambiguous, and its plain meaning should be enforced." *U.S. v. Dunn*, 557 F.3d 1165, 1172 (10th Cir. 2009) (citing *Daines*, 190 P.3d at 1277).

As noted, the parties have conflicting interpretations of Section 1.3 of the ISO Agreement. *See* Docs. 40, Def.'s Br. 9-10; 48, Pl.'s Resp. 16-18. Section 1.3 states

> [BCC] may select any Third Party Service provider that [BCC], in its sole discretion, determines it can support for use in connection with the performance of [BCC's] obligations under this Agreement; provided that, [BCC] may not use the Services in conjunction with a Third Party Service except one listed on <u>Schedule C.</u> Merrick makes no representations or warranties of fitness or performance with respect to any Third Party Service or Third Party Service provider. Merrick is not responsible or liable for the acts or omissions of any Third Party Service provider, or any claims of Merchants or others related to the services provided by a Third Party Service provider.

Doc. 41, ISO Agreement Ex. A. Relying on the language above, Merrick contends that Section 1.3 precludes BCC's breach of contract claim because it relieves Merrick of any liability regarding the fitness or performance of Jet Pay and disavows any representations or warranties of fitness or performance. Doc. 40, Def.'s Br. 9-10. Merrick further asserts that BCC "understood and agreed that Merrick would not be 'responsible or liable for the acts or omissions of any third party service provider,' including JetPay." *Id.* at 10.

BCC contends that Section 1.3 does not shield Merrick from liability because it must be considered in light of other select provisions in the ISO Agreement. Doc. 48, Pl.'s Resp. 16-18.

Specifically, BCC argues that Section 5.2(b) created a duty on the part of Merrick to assist BCC in finding a reasonably acceptable third-party service provider notwithstanding the express disclaimers of Section 1.3. *Id.* Additionally, BCC argues that a list of other provisions "require the parties to communicate regarding the performance of Third Party Service Providers as well as merchants." *Id.* at 16.

The Court determines that the language of the contract is facially ambiguous as to whether Section 1.3 relieves Merrick of liability for representations it made as to the qualifications of JetPay. Section 1.3 expressly states that Merrick does not make any representations or warranties as to the fitness or performance of any third-party service provider. Doc. 41, ISO Agreement Ex. A ¶ 5.2(b). It otherwise shields Merrick from liability for any acts or omissions of a third-party service provider. *Id.* At the same time, Section 5.2(b) requires Merrick to "[a]ssist [BCC] with locating Third Party Service providers reasonably acceptable to [BCC]." Although the phrases "reasonably acceptable" and "fitness" undoubtedly overlap, the Agreement does not provide any explanation as to how these two provisions interact, and nowhere does it provide a definition of the term "acceptable."

Merrick reconciles this apparent inconsistency by insisting that the determination of whether or not a third party service provider is "reasonably acceptable" under Section 5.2(b) rests solely with BCC. Doc. 51, Def.'s Reply 4. Under this interpretation, Merrick would only have to lend assistance to BCC in finding a third-party service provider, and Merrick would meet its obligations regardless of whether the third-party service provider proved to be reasonably acceptable or not. Merrick's interpretation of the Agreement would otherwise shield it from liability for any representations concerning a party's suitability as a third-party service provider based on Section 1.3's disclaimer of any representations of fitness or performance. Doc. 40, Def.'s Br. 10.

- 12 -

The Court does not find Merrick's proffered interpretation completely persuasive, however, because "reasonably acceptable" imposes an objective, rather than a subjective, standard. *See Haymore v. Levinson*, 328 P.2d 307, 309 (Utah 1958) (holding that in contracts involving "satisfaction as to such things as operative fitness, mechanical utility or structural completion in which . . . personal sensibilities . . . would not reasonably be deemed of such predominant importance to the performance," an objective standard should be applied to prevent the party favored by the satisfaction clause from arbitrarily withholding his approval); *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 839 P.2d 10, 22 (Haw. 1992) (applying an "objective reasonable satisfaction" standard when the contract provided that the plaintiff would "obtain and file of record a sewer easement (in form and content reasonably satisfactory to [defendant]"). In fulfilling its obligations under Section 5.2(b), therefore, Merrick was required to assist BCC in locating, not just a third-party service provider, but a third-party service provider that a reasonable person would deem acceptable based on the demands of the contract. This understanding of "reasonably acceptable" means that Merrick's assertions that Section 1.3 shielded it from liability for representations as to whether JetPay was a reasonably acceptable third-party service provider would effectively render Section 5.2(b) a nullity because it would relieve Merrick of its duty to provide any meaningful assistance in locating an acceptable third-party service provider. Such an interpretation is therefore disfavored, and will not be adopted by the Court in the absence of clear indications as to the parties' intent.   *QEP Energy Co.*, 444 F. App'x at 292 (quoting *Vitagraph, Inc.*, 291 P. at 306).

At the same time, however, Merrick may be correct that Sections 1.3 and 5.2(b) are reconcilable.  For instance, if the parties understood "acceptable" to mean that the third-party service provider possessed a certain capacity or met certain criteria, while "fitness" referred to a

provider's overall suitability for the purposes of the contract, then the Sections may be reconcilable because they would be addressing two different aspects of a third-party service provider's qualifications.  Given the plain meaning of the terms in the contract, which require Merrick to assist in finding a provider that is reasonably acceptable while simultaneously shielding it from representing that these providers are fit, this interpretation could reasonably resolve the contradictions between Section 1.3 and 5.2(b).  Because the terms "fitness" and "acceptable" are not defined in the contract, however, the Court cannot discern from its language alone whether such an interpretation is consistent with the parties' intentions.

BCC's interpretation of the contract similarly fails to resolve this ambiguity between Sections 1.3 and 5.2(b).  BCC effectively argues that the disclaimers in Section 1.3 were only effective after Merrick met its obligations under the ISO Agreement to assist BCC in finding a reasonably acceptable third-party service provider.  Doc. 48, Pl.'s Resp. 14-18.  In other words, BCC maintains that Merrick would be shielded from all representations it made as to third-party service providers, except for those made pre-selection that touched on their reasonable acceptability.  *Id.*  Such an interpretation, while giving some effect to all of the terms of the contract, could effectively nullify the disclaimer in Section 1.3, which disavows any representations as to the fitness of the third-party service providers listed in Schedule C as of the time that the ISO Agreement was executed.  Doc. 41, ISO Agreement Ex. A ¶ 1.3.  Again, whether Section 1.3 and 5.2(b) would be reconcilable in the manner proposed by BCC depends on the meaning of "acceptable" and "fitness" as used in the contract. It would similarly depend on the parties' intentions as to how Sections 1.3 and 5.2(b) should interact, intentions which are otherwise unexpressed in the contract and which the Court cannot discern without resort to extrinsic evidence.

The other sections of the contract that BCC cites to in order to support its proposed interpretation do not otherwise establish that BCC's is the only tenable interpretation of the contract.  For instance, the fact that the Agreement restricts BCC to choosing a third-party service provider from a list of providers supplied by Merrick says nothing about whether Merrick intended to make itself liable for representations that it makes as to the reasonable acceptability of these providers.  Doc. 41, ISO Agreement Ex. A ¶ 1.3 & Schedule A.  Although it may seem contradictory in some ways for Merrick to provide a list of "approved" providers while at the same time disavowing any representations as to their fitness, Merrick could just be providing a list of providers who meet necessary criteria but who it has not determined are or are not reasonably acceptable for BCC's purposes.  Similarly, the fact that BCC and Merrick agreed to communicate about the performance of third-party service providers, doc. 41, ISO Agreement Ex. A Schedule D ¶ 4, and the fact that Merrick retained authority to approve a third-party service provider not contained in Schedule C, doc. 41, ISO Agreement Ex. A ¶ 4.13, do not indicate that Merrick was making representations as to providers' fitness and therefore intended to be held liable for its representations as to reasonable acceptability. While these restrictions indicate that Merrick controlled who could be approved as a provider, they do not necessarily indicate that in approving a provider Merrick also determined and represented that they were reasonably acceptable.  Moreover, there is nothing in the contract to indicate how Merrick's approval of a provider coincided with its obligation to assist in locating a reasonably acceptable third-party service provider or whether there were any additional actions that the parties foresaw Merrick taking before it could meet its obligation to assist.  A determination of how the disclaimers interact with Merrick's duties under the Agreement to approve providers and assist BCC will, again, depend on a determination of the meanings of "acceptable" and "fitness."

Because of the uncertain meaning of the terms "fitness" and "acceptable," and given the equally tenable alternative interpretations offered above, the Court determines that Sections 1.3 and 5.2(b) are ambiguous when considered together. *Café Rio*, 207 P.3d at 1240; *WebBank*, 54 P.3d at 1145 (noting that Utah courts have found ambiguity when, "despite the lack of ambiguity in the terms and provisions of the contract themselves, ambiguity exists as to the nature and character of the contract or transaction as a whole."); *Farmers Ins. Exch. v. Versaw*, 99 P.3d 796, 798 (Utah 2004) ("An ambiguity in a contract may arise (1) because of vague or ambiguous language in a particular provision or (2) because two or more contract provisions, when read together, give rise to different or inconsistent meanings, even though each provision is clear when read alone." ).  While a court would normally turn to "relevant and credible extrinsic evidence'" under these circumstances to determine whether the contract was in fact ambiguous, neither party has submitted any parol evidence to guide the Court in determining the parties' intentions. *Daines*, 190 P.3d at 1277.  The Court cannot, therefore, assess whether the agreement is ambiguous in light of the surrounding circumstances, and cannot at this time rule on whether Section 1.3 shields Merrick from liability for any alleged representations as to the reasonable acceptability of JetPay.

As noted above, however, even if Merrick is shielded from liability for its representations as to the acceptability of JetPay pre-selection, BCC can still maintain a claim based on Merrick's alleged failure to disclose information indicating that JetPay was not a reasonably acceptable third-party service provider.  While Merrick focuses its argument specifically on its disclaimers in Section 1.3 that it makes "no representations and warranties" as to a provider's fitness or performance and that it is not "liable for the acts or omissions of any Third Party Service provider," it does not directly address BCC's claims that it breached its obligations under Section 5.2(b) when it failed to disclose

pertinent information as to JetPay's acceptability.  Docs. 40, Def.'s Br. 10-11; 51, Def.'s Reply 4.  As BCC points out, by withholding such information, Merrick inhibited BCC in its ability to locate a third-party service provider without making any representations as to the fitness of a third-party service provider.  Doc. 48, Pl.'s Resp. 18.  Accordingly, the disclaimers of Section 1.3 as to representations and warranties are not implicated.  Similarly, in holding Merrick potentially liable for its failure to disclose information, the Court would not be basing liability on the "acts and omissions" of JetPay in contravention of Section 1.3, but would instead be basing liability on Merrick's own failure to perform its obligations under Section 5.2(b).  Thus, in alleging that BCC failed to disclose information regarding the acceptability of JetPay as a third-party service provider, BCC has properly stated a claim for breach of Merrick's contractual obligations under Section 5.2(b).

Thus, to the extent BCC's claim relies on the Merrick's alleged representations as to the acceptability of JetPay as a third-party service provider, the Court concludes that, absent a contrary showing through extrinsic evidence, the ISO Agreement is facially ambiguous as to whether Section 1.3 shields Merrick from liability for any alleged representations it made as to the acceptability of JetPay.  The parties will need to submit extrinsic evidence at a later date in order to demonstrate their intentions as to the conflicting provisions in light of the surrounding circumstances when the Agreement was executed.  By contrast, to the extent that BCC claims that Merrick breached its duty to assist BCC in locating a reasonably acceptable third-party service provider when it failed to disclose pertinent information as to JetPay's acceptability, it has properly made out a claim for breach of contract. Accordingly, Merrick's Motion to Dismiss is hereby **DENIED** as to BCC's first claim for breach of contract.

2.      Wrongful Withholding of Payments Made to BCC's Merchants

BCC also contends that Merrick violated the ISO and Merchant Agreements by making wrongful payments totaling $365,000 to BCC's merchants and wrongfully withholding that sum from "residual payments" owed to BCC.  Doc. 31, Sec. Am. Compl. ¶¶ 13, 38, 45.  BCC's Response ties this alleged breach to Sections 2.1 and 2.3 of the ISO Agreement and Sections 1.15 and 2.1 of the Merchant Agreement.  Doc. 48, Pl.'s Resp. 21-22.  However, BCC does not further explain the connection between these provisions and the alleged wrongful actions by Merrick.  Merrick, in turn, does not direct much argument to showing that these actions are not properly pled or do not constitute a breach, but instead merely asserts that BCC's "reference to a laundry list of passages" does not and cannot demonstrate a breach of contract.  Doc. 51, Def.'s Reply 5.

After a review of the allegations and the referenced provisions, the Court finds that BCC has failed to allege sufficient facts to make out a claim for breach of contract based on Merrick's alleged wrongful payments to BCC's merchants and withholding of that sum from monies owed to BCC.  Neither Section 2.1 or 2.3 of the ISO Agreement that BCC cites appear more than tangentially related to payments to merchants.  Section 2.1 concerns Merrick's responsibilities regarding BCC's registration as an ISO/MSP and BCC's responsibilities as an ISO/MSP.  *See* Doc. 41, ISO Agreement Ex. A.  The language of the provision does not lend itself to BCC's breach of contract claim because it does not address the parties' respective responsibilities regarding residual payments to BCC.[2]

---

[2] Section 2.1 states:

Merrick and [BCC] will register [BCC] as an "Independent Sales Organization" or a "Member Service Provider" with each Association.  Merrick will: (i) act as a liaison between ISO and each Association, (ii) cooperate with [BCC] in making such registrations and filings and obtaining the necessary approvals from the Associations, and (iii) keep [BCC] informed as to the Rules.  Maintaining all necessary approvals from the Associations is a condition precedent to the performance by the parties

Section 2.3 requires Merrick and BCC to "exercise their respective rights and perform their respective obligations under [the ISO Agreement] in compliance with" various laws, rules, and regulations.[3]  But BCC does not explain and no allegations show how Merrick's payments or withholding violated any of these laws, rules, or regulations or how these provisions otherwise afford BCC a right of recovery as to the wrongful payments of $365,000.

The cited provisions of the Merchant Agreement similarly do not afford BCC a right of recovery against Merrick for the alleged wrongful payments. Section 1.15 of the Merchant Agreement is entitled "Payment."  Doc. 48-3, Merchant Agreement Ex. B.  The provision details how Merrick may pay merchants and the rights merchants have with respect to receiving payments, but does not concern the rights and responsibilities of Merrick and BCC to each other.  *Id.*  More specifically, it does not address whether Merrick was obligated to make residual payments to BCC or explain whether Merrick was entitled to withhold these payments and direct them to merchants for any reason.

Section 2.1 of the Merchant Agreement is titled "Collection of Card Transactions" and falls

---

of their respective obligations hereunder. [BCC] (i) will pay, or promptly reimburse Merrick for, any fees, assessments, levies or charges imposed by each Association related to [BCC]; (ii) will execute such applications, agreements and other forms as may be required by each Association in order to maintain [BCC] as an approved or registered ISO; and (iii) agrees that it has received, understands and will comply with the Rules.

Doc. 41, ISO Agreement Ex. A.

[3] Section 2.3 requires that Merrick and BCC act in compliance with:

(i) all applicable federal, state, local, administrative laws, rules, regulations and interpretations including, without limitation, consumer protection laws, rules and regulations; (ii) the Rules; (iii) the National Automated Clearinghouse Association ("NACHA") Operating Rules; and (iv) the internal security and privacy policies and guidelines of Merrick, as required by safe and sound banking practices, as any or all of the foregoing may be amended, revised, or replaced from time to time.

Doc. 41, ISO Agreement Ex. A.

under the heading "BANK'S RIGHTS AND DUTIES." *Id.* at 48.  In pertinent part, Section 2.1
reads:

> Bank shall only provisionally credit the value of collected Card Transaction [sic] to
> Merchant's Account and reserves the right to adjust amounts collected to reflect the
> value of Charge backs, fees, penalties, late submission changes and items for which
> Bank did not receive final payment.

*Id.*  While this provision does concern Merrick's payments to merchants when problems like charge

backs arise, like Section 1.15 it only generally concerns the rights and duties between Merrick,

merchants, and BCC, and does not address the obligations between Merrick and BCC.  Similarly,

by its terms, Section 2.1 does not address any obligation with regards to residual payments to BCC,

and therefore would not apply to Merrick's alleged wrongful payment of funds to merchants.  With

respect to Merrick's alleged payments to merchants and withholding of monies from BCC, it is not

apparent to the Court that Section 1.15 or 2.1 of the Merchant Agreement entitle BCC to any relief.

The one provision that the Court can find in either agreement that would seemingly apply

to the alleged breach here is Article 8 of the ISO Agreement, entitled "PAYMENTS."  Doc. 41, ISO

Agreement Ex. A Art. 8.  BCC alleges that Merrick withheld "monies it owed to BCC for residual

payments."  Doc. 31, Sec. Am. Compl. ¶ 38.  The Court assumes that the term "residual payments"

refers to the "monthly payment amount" (MPA) discussed in Article 8.  *See* Doc. 41, ISO Agreement

Ex. A Art. 8.  Under Section 8.1(a), Merrick has a duty to "prepare and deliver to [BCC]" a

"Monthly Report" detailing the number of transactions processed by merchants.  Doc. 41, ISO

Agreement.  Under Section 8.1(b), Merrick has a duty to "pay the MPA to [BCC], if any, shown on

such Monthly Report."  *Id.*  Then, "[if BCC] notifies Merrick that it disagrees with the MPA,"

Section 8.1(c) requires both BCC and Merrick to work together in good faith to determine the

correct MPA owed to BCC.  *Id.*  The Complaint, however, makes no mention of a monthly transaction report or BCC's notification to Merrick that it disagrees with such a monthly report.  *See* Doc. 31, Sec. Am. Compl. ¶ 38.  The Court cannot determine from the pleadings whether BCC notified Merrick if it disagreed with the MPA or if Merrick ever even delivered a report with regards to the allegedly unlawfully withheld $365,000.  It also cannot discern whether the parties attempted to work together to determine the proper MPA owed to BCC. Accordingly, the Court cannot conclude that BCC has pled sufficient facts to show that Merrick breached its obligation under Article 8.

The Court acknowledges it is *possible* that Merrick's alleged withholding of residual payments constitutes a breach of the ISO or Merchant Agreements.  However, the provisions BCC cites do not plausibly suggest BCC is entitled to relief beyond the speculative level.  BCC fails to link Merrick's actions to the referenced provisions or to explain how Merrick's wrongfully withholding $365,000 constitutes a breach of any of these provisions.  Therefore, Merrick's Motion to Dismiss as to BCC's claim for breach of contract based on the wrongful payment of $365,000 by Merrick to BCC's merchants is hereby **GRANTED**.

3.      Wrongful Withholding of Payment Made to JetPay

Finally, BCC alleges that Merrick "wrongfully converted One Hundred Thousand Dollars ($100,000.00) from BCC's residual payments and paid that sum to Jet Pay."  Doc. 31, Sec. Am. Compl. ¶ 39.  The Complaint does not clarify whether these allegations are intended to make out a breach of contract claim or a conversion claim, but Merrick contends that the allegations necessarily make out a claim for breach of contract and that they are preempted by Section 1.3 of the ISO Agreement, which provides that

> [BCC] is solely responsible to pay any Third Party Service Provider. Notwithstanding the foregoing, Merrick may, but is not required to, pay any Third Party Service provider and deduct the payments from the Monthly Payment Amount (as defined below) *only in the event that the Third Party Service provider notifies Merrick that it will cease providing services for [BCC's] merchants if not otherwise paid.*

Doc. 40, Def.'s Br. 11; 41, ISO Agreement Ex. A (emphasis added). In its Response, BCC does not expressly clarify whether it intends to make out a conversion or a breach of contract claim as to the "wrongfully converted $100,000," but it defends the claim as if it is a breach of contract claim, arguing that "there is nothing before the Court to confirm or deny the existence" of JetPay's demands for payment. Doc. 48, Pl.'s Resp. 22-23.

The Court concludes that BCC has pled sufficient facts to make out a claim for breach of contract based on BCC's alleged wrongful withholding and payment of $100,000 to JetPay. Contrary to Merrick's assertions, the pleadings do not provide the conditions precedent necessary to authorize Merrick's payment to JetPay. The pleadings do state that Merrick learned of "JetPay's wrongful demands for payment," doc. 31, Sec. Am. Compl ¶ 39; however, in order for Merrick to bypass BCC and pay JetPay, Section 1.3 requires that JetPay also notify Merrick that "it will cease providing services for [BCC's] merchants if not otherwise paid." Doc. 41, ISO Agreement Ex. A ¶ 1.3. Nowhere in its Complaint does BCC allege that JetPay notified Merrick that it would cease providing services. *See* Doc. 31, Sec. Am. Compl. ¶ 39. Rather, the Complaint alleges that, after learning of BCC and JetPay's contract dispute and receiving "wrongful demands for payment" from JetPay, Merrick "wrongfully converted" $100,000 "from residual payments and paid that sum to JetPay." *Id.* The Court determines that these allegations are sufficient to make out a claim that Merrick breached its contractual obligations under Section 1.3 when it withheld $100,000 from BCC's MPA and paid the same to JetPay. Merrick's Motion to Dismiss is therefore **DENIED** as to BCC's claim

that it breached the contract when it wrongfully paid $100,000 to JetPay.

4.       BCC's Theory of Implied Covenant of Good Faith and Fair Dealing

As a final matter, BCC claims that Merrick also breached the ISO Agreement under a theory of implied covenant of good faith and fair dealing recognized by Utah.  Doc. 48, Pl.'s Resp. 18-21. BCC asserts that Merrick had a "good faith contractual obligation to BCC to fully and fairly disclose material information in its possession that would assist BCC in locating a Third Party Service Provider reasonably acceptable to it."  *Id.* at 20.  Merrick contends that the Complaint does not contain the necessary allegations to establish breach of an implied covenant.  Doc. 51, Def.'s Reply 6-7.  More importantly, Merrick points out, correctly, that BCC untimely raised its claim for breach of an implied covenant of good faith and fair dealing in its Response. *Id.*  If a theory of liability or claim is not raised in the Complaint and first asserted in the Response, it is not properly before the Court.  *See De Franceschi v. BAC Home Loans Servicing, L.P.*, 477 F. App'x 200, 204 (5th Cir. 2012) ("[D]istrict courts do not abuse their discretion when they disregard claims or theories of liability not present in the complaint and raised first in a motion opposing summary judgment").  Accordingly, BCC cannot recover on its theory of implied covenant of good faith and fair dealing.

Even assuming *arguendo* that BCC's breach of implied covenant claim is properly before the Court, the claim would fail because it is duplicative of BCC's breach of contract claim.  Under Utah law "a plaintiff may not demonstrate a breach of the implied covenant of good faith simply by showing a breach of an express covenant."  *Kearl*, 293 F. App'x at 609; *see also Canopy Corp. v. Symantec Corp.*, 395 F. Supp. 2d 1103, 1111 (D. Utah 2005) ("[Plaintiff's] arguments, however, rest solely on [Defendant's] termination of the Agreement.  Such actions can be redressed by the breach of contract claim.  To state a separate claim, [Plaintiff] must demonstrate some implied promise

separate from a breach of the Agreement's term provision that could support this cause of action."). BCC's claims for breach of implied covenant and breach of contract both rest on the same allegations – Merrick's misrepresentations and failure to disclose in violation of its duties to assist under Section 5.2(b). *See* Doc. 48, Pl.'s Resp. 16-21. As BCC states, "[t]he only open question before the Court is whether Merrick could fairly and in good faith withhold material information required by BCC to perform the ISO Agreement and still perform its contractual obligations." *Id.* at 20. But as the Court has found, such conduct would constitute a breach of the express terms of the contract and thus cannot be the predicate for a breach of an implied covenant claim.

In summary, the Court concludes that BCC can make out two of its three breach of contract claims. BCC has pled sufficient facts to make out its claim that Merrick breached the ISO Agreement when it failed to disclose information as to JetPay's acceptability as a third-party service provider. Section 1.3 does not preclude this claim, although the contract is ambiguous as to whether Section 1.3 precludes a claim for breach of contract based on Merrick's affirmative representations concerning whether JetPay was a reasonably acceptable third-party service provider. BCC has also stated a claim for breach of contract based on its allegations that Merrick wrongfully paid JetPay $100,000 using residual payments it owed BCC. Accordingly, Merrick's Motion to Dismiss is hereby **DENIED** as to these claims. BCC fails to make sufficient allegations to establish its claim for breach of contract based on Merrick's "wrongful payment" of $365,000 to merchants from residual payments owed to BCC. Additionally, BCC's claim that Merrick breached an implied covenant of good faith and fair dealing is not properly before the Court and, in the alternative, fails because it is duplicative of BCC's breach of contract claim. Accordingly, Merrick's Motion to Dismiss is hereby **GRANTED** as to these claims.

B.      *BCC's Negligent Misrepresentation, Fraud by Non-disclosure, and Conversion Claims*

BCC also alleges claims for negligent misrepresentation, fraud by non-disclosure, and conversion against Merrick. Merrick seeks dismissal of BCC's negligent misrepresentation and fraud by non-disclosure claims on three grounds: (a) the economic loss doctrine bars the claims; (b) the claims fail to meet the pleading standards set forth in Federal Rule of Civil Procedure 9(b); and (c) the claims fail under applicable state tort law.[4] Doc. 40, Def.'s Br. 12-19. In its Response, BCC does not address Merrick's economic loss doctrine defense. Furthermore, BCC concedes that its negligent misrepresentation and fraud by non-disclosure claims do not meet the pleading standards of Rule 9(b). Doc. 48, Pl.'s Resp. 23. However, BCC does request leave to amend its pleadings in accordance with the heightened requirements of Rule 9(b). *Id.* at 23-24.

With respect to BCC's conversion claim, Merrick similarly seeks dismissal because (a) the economic loss doctrine bars the claim, and (b) the claim fails under applicable state tort law. Doc. 40, Def.'s Br. 12-16, 19-20. BCC has similarly not responded to Merrick's arguments for dismissal of its conversion claim.[5]

The Court will first turn its attention to BCC's negligent misrepresentation and fraud claims and will show that these claims fail under both the Utah economic loss doctrine and the heightened

---

[4] Because the Court finds that (a) the economic loss rule bars BCC's negligent misrepresentation and fraud by non-disclosure claims and (b) the claims do not meet the pleading standards set forth by Rule 9(b), it need not address the claims' viability under applicable state law.

[5] As Merrick notes, BCC has apparently abandoned its conversion claim because it does not address the claim at all in its Response. Doc. 51, Def.'s Reply 10 n.8. Notwithstanding BCC's failure to address Merrick's arguments for dismissal, the Court reviews its conversion claim below.

pleading standards of Rule 9(b).[6]  The Court will then address BCC's conversion claim, which similarly fails under the economic loss doctrine and is otherwise insufficiently pled in BCC's Complaint.

      1.     Negligent Misrepresentation and Fraud by Non-disclosure Claims

          a.     Economic loss doctrine

The economic loss doctrine attempts to create a boundary between tort and contract law. *SME Industries, Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.*, 28 P.3d 669, 680 (Utah 2001). In Utah, "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach *absent an independent duty of care under tort law*." *Hermansen v. Tasulis*, 48 P.3d 235, 240 (Utah 2002) (quoting *Grynberg v. Agric. Tech, Inc.*, 10 P.3d 1267, 1269 (Colo. 2000)).  In *Reighard v. Yates*, the Supreme Court of Utah explained the doctrine as follows:

> [O]nce there is a contract, any tort claim must be premised upon an independent duty that exists apart from the contract.  All contract duties, and all breaches of those duties . . . must be enforced pursuant to contract law.  The independent duty principle is a means of measuring the reach of the economic loss rule.  When a duty

---

[6] Merrick argues that the Court should apply Utah's economic loss rule.  Doc. 40, Def.'s Br. 12 n.7. BCC has not argued that choice of law will affect application of the economic loss rule.  Indeed, BCC has not addressed the defense at all.  Even if BCC did contest the Court's application of Utah law and the Court applied Texas law, however, the Court's ultimate conclusion as to BCC's claims would likely not change because the economic loss doctrine is similar in both states.  *See Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 417 (Tex. 2011) (noting that the economic loss rule applies when the claim arises from the "breach of a duty created under contract, as opposed to a duty imposed by law"); *see also Picard v. Chase Home Finance, LLC*, No. 3:11-CV-439-L, 2011 WL 5333060, at *6 (N.D. Tex. Nov. 3, 2011) ("if a contract exists between the parties regarding the matter in dispute, then the agreement, not the common-law tort principles, governs the dispute").

    BCC also does not contest Merrick's argument that the Court should apply Utah law in resolving its tort claims, and in fact seems to agree that the Court should apply Utah law to the parties' entire dispute. Doc. 40, Def.'s Br. 8; 48, Pl.'s Resp. 11.  Accordingly, the Court will rely on Utah law when addressing BCC's tort claims as well.

exists that does not overlap with those contemplated in a contract, the economic loss rule does not bar a tort claim because the claim is based on a recognized independent duty of care and thus does not fall within the scope of the rule.

285 P.3d 1168, 1177 (Utah 2012) (citations omitted).  The Tenth Circuit has found that a plaintiff's claims of negligent misrepresentation and fraud "are not cognizable under Utah law when they are based on the allegations that are the gravamen of the contract claim." *Wardley Corp. v. Meredith Corp.*, 93 F. App'x 183, 186 (10th Cir. 2004).

Merrick contends that the economic loss rule bars BCC's negligent misrepresentation and fraud by non-disclosure claims.  Doc. 40, Def.'s Br. 12-16.  Merrick asserts that because BCC's tort claims arise from the same alleged misrepresentations and withholding of information that are the basis of BCC's contract claims, the resulting economic damages must "flow from a purported failure to perform obligations set forth in the ISO Agreement." *Id.* at 15.  Merrick further argues that BCC cannot demonstrate that Merrick owed any duty of care to BCC outside of its contractual duties. *Id.*  Thus, Merrick contends the economic loss rule requires that BCC assert its claims only as breach of contract claims.  *Id.*

The Court finds that the economic loss rule bars BCC's negligent misrepresentation and fraud by non-disclosure claims.  BCC bases these claims on the same factual allegations it asserts in support of its breach of contract claims.  *See* Doc. 31, Sec. Am. Compl. ¶¶ 49-51, 54-56.  As discussed above, these allegations provide that Merrick misrepresented JetPay's capabilities, assured BCC of JetPay's qualifications, and withheld information regarding JetPay.  These allegations and the resulting injury to BCC arise out of Merrick's duties under the express terms of the ISO Agreement,[7] and are thus

---

[7] *See* Doc. 41, ISO Agreement Ex. A ¶ 5.2(b) (Merrick will "[a]ssist [BCC] with locating Third Party Service providers reasonably acceptable to [BCC]."); *see also* Doc. 48, Pl.'s Resp. 16-18.

subsumed by the duties contained in the Agreement. *See, e.g.*, *Digecor Inc. v. E.Digital Corp.*, No. 2:06-CV-437-TS, 2007 WL 185477, at *5 (D. Utah Jan. 19, 2007) (dismissing claims for fraud and negligent misrepresentation because they were barred by the economic loss doctrine); *Anapoell v. American Express Business Fin. Corp.*, No. 2:07-CV-198-TC, 2007 WL 4270548, at *6-*7 (D. Utah Nov. 30, 2007) (dismissing claims for intentional and negligent misrepresentation, fraud, and conversion under the economic loss doctrine). BCC does not otherwise allege that Merrick breached a duty that was independent of these contractual duties. Accordingly, the Court finds that the economic loss rule bars BCC's claims of negligent misrepresentation and fraud by non-disclosure.[8]

      b.     Rule 9(b) pleading standards

Assuming *arguendo* that BCC's claims are not barred by the economic loss rule, Merrick contends that BCC nevertheless fails to satisfy the pleading standards set forth by Rule 9(b) because it does not allege its claims with any degree of particularity. Rule 9(b) provides, in pertinent part, that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). Merrick acknowledges that, by its terms, Rule 9(b) does not apply to negligent misrepresentation claims, but correctly points out that 9(b)'s heightened pleading standards will apply to negligent misrepresentation claims when fraud and

---

[8]Although BCC may argue that if it ultimately cannot bring a claim for breach of contract based on Merrick's representations regarding JetPay's acceptability as a third-party service provider, then it may be able to make out a claim for negligent misrepresentation that is not barred by the economic loss rule, the Court does not agree. In addition to being improperly pled under Rule 9(b), BCC has wholly failed to identify an independent duty upon which it could base its negligent misrepresentation claim. *Aclys Int'l, LLC v. Equifax, Inc.*, No. 2:08-CV-00954, 2010 WL 1816248, at *2 (D. Utah May 5, 2010) *aff'd by Aclys Int'l v. Equifax*, 438 F. App'x 689 (10th Cir. 2011) ("[I]t appears that negligent misrepresentation falls outside the economic loss rule only when the party making the misrepresentation owes an independent duty of care."). Furthermore, the Court cannot discern from the pleadings that Merrick owed BCC any duty outside of those contained in the contract, and therefore its negligent misrepresentation claims are properly dismissed.

negligent misrepresentation claims are based on the same set of alleged facts, as they are here. *See* Doc. 31, Sec. Am. Compl. ¶¶ 18-21; *Lone Star Fund V (U.S.), L.P.*, 594 F.3d at 387 n.3. BCC does not offer any opposing arguments, but instead admits that its negligent misrepresentation and fraud claims are insufficiently pled. Doc. 48, Pl.'s Resp. 23-24.

Taking into account the pleadings as well as BCC's admission that its pleadings are inadequate, the Court concludes that BCC has not pled its claims of fraud and negligent misrepresentation with any degree of "specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation of why they were fraudulent," and has therefore failed to state a claim for fraud or negligent misrepresentation. *Plotkin*, 407 F.3d at 696. Merrick's Motion to Dismiss BCC's claims of negligent misrepresentation and fraud by non-disclosure is therefore **GRANTED**.

### 2.   Conversion Claim

Merrick contends that the economic loss rules also bars BCC's conversion claim. Doc. 40, Def.'s Br. 12-16. Merrick asserts that, like BCC's misrepresentation and fraud claims, its conversion claim arises out of a failure to comply with the terms of the ISO Agreement, not some other independent duty. *Id.* at 15. BCC, again, offers no argument in opposition.

Although it is not exactly clear from BCC's Complaint what allegations its conversion claim is intended to rest upon, it is likely based on Merrick's alleged wrongful payment of $365,000 and $100,000 to merchants and JetPay respectively from residual payments owed to BCC . Doc. 31, Sec. Am. Compl. ¶¶ 38-39. BCC's claim for conversion as to the these payments is based on duties that Merrick owed to BCC under the ISO Agreement, as noted above, and therefore would be barred by the economic loss rule. *See* Pl.'s Resp. 21-23; *Anapoell*, 2007 WL 4270548, at *6-*7. Furthermore,

BCC makes no attempt to show that Merrick violated an independent duty outside of the contract in making these payments.  Thus, because the economic loss rule would otherwise bar BCC from making a claim, BCC fails to make out a claim for conversion against Merrick. Merrick's Motion to Dismiss as to BCC's conversion claim is therefore **GRANTED**.

## IV.

## CONCLUSION

For the reasons discussed above, the Court **GRANTS in part** and **DENIES in part** Merrick's Motion to Dismiss (doc. 40).  As to BCC's claims that Merrick (1) breached its obligations to assist BCC to find a reasonably acceptable third-party service provider when it failed to disclose information related to JetPay, and (2) breached the ISO Agreement when it paid JetPay $100,000 from residual payments owed to BCC, Merrick's Motion is **DENIED**. The Court **GRANTS** Merrick's Motion as to BCC's claim that Merrick breached its agreements with BCC when it withheld and paid $365,000 to merchants from residual payments owed to BCC.  The Court also **GRANTS** Merrick's Motion as to BCC's claims for negligent misrepresentation, fraud by nondisclosure, and conversion. The Court notes that its holding here does not affect BCC's claims against Defendants JetPay or Voigt.

BCC requests that it be allowed to amend its pleadings in order to plead them with greater specificity.  Doc. 48, Pl.'s Resp. 23-24.  Normally, courts will afford a plaintiff the opportunity to overcome pleading deficiencies, unless it appears certain that such re-pleading would be futile. *See Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977) ("[A] court ordinarily should not dismiss the complaint except after affording every opportunity for the plaintiff to state a claim upon which relief can be granted."). Even though this Order is the Court's first review of BCC' allegations, the

Court concludes that it would be futile to allow BCC to re-plead its tort claims because they are barred by the economic loss rule. BCC additionally has failed to identify any independent duty upon which it could base its tort claims, and the Court accordingly determines that allowing BCC to attempt to re-plead these claims at this point in the litigation would only lead to undue delay. *Inline Corp.*, 2002 WL 1331885, at *1 (noting that a district court may consider such factors as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment" when deciding whether to allow a party to amend).

The Court will, however, allow BCC to re-plead its breach of contract claim as to the alleged wrongful withholding and payment of $365,000 from residual payments owed to BCC. If BCC chooses to re-plead this claim, it must specify exactly which provisions of its agreements with Merrick that this payment breached. It must also provide an explanation as to how the payment constituted a breach of such provisions and not just merely cite to contract provisions.

If BCC determines that it is able to re-plead this claim and overcome the grounds for its dismissal stated herein, it should do so by no later than thirty (30) days from the date of this Order. Further, any re-pleading shall be accompanied by a synopsis of no more than ten (10) pages, explaining how the amendments overcome the grounds stated for dismissal in this Order. Should BCC re-plead, Merrick is hereby granted leave to file a response to BCC's synopsis. Any response shall not exceed ten (10) pages and must be filed within fourteen (14) calender days of the re-pleading. No further briefing will be permitted

SO ORDERED.

DATED July 28, 2014

_____

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE