UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| BCC MERCHANT SOLUTIONS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:12-CV-5185-B |
| | § | |
| JET PAY, LLC, TRENT R. VOIGT, and | § | |
| MERRICK BANK CORPORATION, | § | |
| | § | |
| Defendants. | § | |

<u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are two separate motions for summary judgment. The first, Defendant

Merrick Bank Corporation's ("Merrick") Motion for Summary Judgment (doc. 183) ("Merrick's

MSJ"), asserts, *inter alia*, that Plaintiff BCC Merchant Solutions, Inc. ("BCC") lacks constitutional

and prudential standing to pursue its remaining breach of contract claim against Merrick, who

entered into the contract at issue with BCC's wholly-owned subsidiary. Agreeing with Merrick that

BCC may not maintain its breach of contract action or substitute its subsidiary as the real party in

interest at this late juncture, the Court, as follows, **GRANTS** Merrick's MSJ.[1]

The second motion, Defendants JetPay, LLC's ("JetPay") and Trent R. Voigt's ("Voigt")

Motion for Summary Judgment (doc. 180) ("JetPay's and Voigt's MSJ"), presents numerous grounds

for entering judgment in their favor on all or part of BCC's state law tort and contract claims,

including, among other grounds, the economic loss doctrine, a contractual bar on consequential

---

[1] In light of this ruling, the Court additionally **FINDS MOOT** Merrick's Motion to Strike Jury
Demand (doc. 234).

- 1 -

damages, and BCC's purported failure to establish its claims and damages arising therefrom. Finding summary judgment warranted for all but BCC's breach of contract claim against JetPay, the Court, for the reasons that follow, **GRANTS IN PART** and **DENIES IN PART** JetPay's and Voigt's MSJ.[2]

## I.

## BACKGROUND

The events in this case took place in the industry responsible for processing credit card transactions between cardholders and merchants. Defendant Merrick, an industrial bank based in Utah, serves as an intermediary in this industry between merchants and credit card issuers; its role, on the front-end of this process, is to acquire credit card transactions from merchants and transmit the issuer's approval or denial; on the back-end, it settles the payments that issuers owe merchants.

Some of the services Merrick provides in this role are outsourced to Independent Sales Organizations ("ISO"). One such ISO is Plaintiff BCC, a small company registered and based in Missouri. BCC alleges that it contracted with Merrick to market Merrick's services to merchants, and enter into agreements with such merchants whom Merrick approved. BCC's alleged agreement with Merrick also required it to contract with approved third party service providers tasked with lending Merrick processing and merchant account reporting services. One of the third party service providers that BCC eventually contracted with is Defendant JetPay, a limited liability company based in Texas. Defendant Voigt, a resident of Texas and the last named defendant in this case, is JetPay's President.

BCC filed this action against Defendants after allegedly suffering significant financial losses due to JetPay's purported failure to adequately perform its contractual obligations. In addition to

---

[2] Also discussed below, the Court **OVERRULES** and **DENIES** Defendants JetPay's and Voigt's Objections and Motions to Strike Plaintiff's Exhibits (doc. 222).

asserting that JetPay is at fault for its contractual breach, BCC claims that Merrick is contractually responsible for at least part of these losses, and that JetPay and Voigt are liable for their misrepresentations that set the losses in motion. After more than two years litigating these claims, Defendants now move for summary judgment. The Court will address, in turn, Merrick's MSJ then JetPay's and Voigt's MSJ. But first, the Court begins with a review of the applicable legal standard.

## II.

## SUMMARY JUDGMENT LEGAL STANDARD

The standard of review governing motions for summary judgment is well established. Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate if "there is no genuine dispute as to any material fact." FED. R. CIV. P. 56(a). A "material" fact is one that "'might affect the outcome of the suit under the governing law,'" and a dispute is "genuine" when "'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Tagore v. United States*, 735 F.3d 324 (5th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In analyzing whether a dispute is "genuine," courts "consider all facts and evidence in the light most favorable to the nonmoving party [,] . . . draw all reasonable inferences in favor of the nonmoving party [,] . . . [and] disregard all evidence favorable to the moving party that the jury is not required to believe." *Haverda v. Hay County*, 723 F.3d 586, 591 (5th Cir. 2013) (quotation marks and internal citations omitted).

Procedurally, the movant "bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of" the record that "it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where, as here, the non-movant bears the burden of proving such material facts at trial, movants

may satisfy their burden by either affirmatively showing the non-movant's inability to establish such material facts or "merely demonstrat[ing] an absence of evidentiary support in the record for the non-movant's case." *Wesley v. Gen. Drivers, Warehousemen & Helpers Local*, 745, 660 F.3d 211, 213 (5th Cir. 2011) (quoting *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 355 (5th Cir. 2010)). Once movants fulfill their initial responsibilities, "the burden shifts to the non-movant to produce evidence of the existence" of a genuine dispute regarding the material facts at issue. *Bayle*, 615 F.3d at 355.

## III.

## MERRICK'S MSJ

The Court first addresses Merrick's MSJ.[3] BCC's claims against Merrick have been significantly pared down by the Court's July 28, 2014 Memorandum Opinion and Order (doc. 79) ("July 28 Order") granting in part and denying in part Merrick's Rule 12(b)(6) Motion to Dismiss.[4] What remains in the dispute between these two parties are portions of a breach of contract claim in which BCC alleges that Merrick breached its obligations under a "Merchant ISO Agreement" (the "ISO Agreement") dated November 10, 2008. *See* Merrick's App. 7-63, Ex. A-1 (hereinafter cited as "ISO Agreement"). At the center of this dispute is whether BCC is entitled to enforce the ISO Agreement, even though the contract plainly states that this ISO Agreement "is made by and between Merrick Bank Corporation . . . and BankCard Central, Inc., a Missouri corporation with

---

[3] For reference, the parties' filings relevant to Merrick's MSJ (doc. 183), as cited herein, include: Doc. 184, Def. Merrick's Br. Supp. Mot. Summ. J. (hereinafter, "Merrick's MSJ"); Doc. 185, Def. Merrick's App. Supp. Mot. Summ. J. (hereinafter, "Merrick's App."); Doc. 211, Pl.'s Br. Supp. Resp. Opp'n Def. Merrick's Mot. Summ. J. (hereinafter, "Pl.'s Resp. Opp'n Merrick's MSJ"); Doc. 212, Pl.'s App. Supp. Resp. Opp'n Def. Merrick's Mot. Summ. J. (hereinafter, "Pl.'s App. Opp'n Merrick's MSJ"); and Doc. 217, Def. Merrick's Reply Opp'n Pl.'s Resp. (hereinafter, "Merrick's Reply").

[4] Pursuant to the July 28 Order, BCC subsequently repled a portion of its breach of contract claim, which the Court sustained in part and dismissed in part in its Order dated January 23, 2015 (doc. 165).

principal offices located [in Kansas City, Missouri]."*See* ISO Agreement.

Some brief background here: BankCard Central, Inc. ("BankCard") has been a wholly-owned subsidiary of BCC at all relevant times in this case. Richard Nobel registered both BankCard and BCC under Missouri law in the early 2000s, and in January 2007 all of BankCard's shares were transferred to BCC. *See* Pl.'s App. Opp'n Merrick's MSJ 2, 63.[5] Thereafter, Nobel says that BCC used "Bankcard Central" as a registered trade name, that BankCard and BCC shared employees, accounts, and records, and that the names BCC and BankCard began to be used interchangeably in course of business. *Id.* at 2-3, 64-66. Nonetheless, BCC does not dispute that BankCard remained a separate entity after becoming BCC's wholly-owned subsidiary in January 2007. *See id.* at 3. Nor does it dispute that the ISO Agreement with Merrick dated November 10, 2008 named "BankCard Central, Inc." alone, without reference to BCC or the trade name "Bankcard Central." *See* ISO Agreement.

Based on the foregoing, Merrick now moves for summary judgment on the ground that BCC lacks standing to sue for Merrick's alleged breach of the ISO Agreement. *See* Merrick's MSJ 11-18. Merrick first says that, because BCC was undisputedly not a party to the ISO Agreement, there is no genuine dispute that BCC lacks standing under Article III of the U.S. Constitution to bring this breach of contract claim in its own name. *See id.* Alternatively, Merrick asserts that summary judgment is similarly appropriate under "Rule 17 of the Federal Rules of Civil Procedure, which embodies prudential standing limitations" on claims belonging to third parties. *Id.* at 20.

"Standing," in general, refers to "[a] party's right to make a legal claim or seek judicial enforcement of a duty or right." *Black's Law Dictionary* (10th ed. 2014). As used in federal courts,

_____

[5] Some of these facts were also drawn from public filings with the Missouri Secretary of State, which BCC asks the Court to take judicial notice of. *See* Pl.'s Resp. Opp'n Merrick's MSJ 3 n.1.

"'standing' subsumes a blend of constitutional requirements and prudential considerations."[6] *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982) (citing *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). Constitutional standing derives from "the 'case' or 'controversy' requirement of Article III," and encompasses "'the irreducible constitutional minimum'" parties must satisfy before invoking the jurisdiction of a federal court. *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)). Prudential standing, in contrast, is a judicially-created "doctrine not derived from Article III and not exhaustively defined but encompassing" certain principles that closely resemble either Article III's requirements or the substantive law question of "whether a person in the litigant's position will have a right of action on the claim." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386, 1387 n.3 (2014) (quotation marks and citations omitted).[7]

While courts are "not always . . . clear" as to which form of "standing" they are addressing, the distinction is crucial, as Article III provides immutable "limitation[s] on judicial power," not mere "factor[s] to be balanced in the weighing of so-called 'prudential' considerations." *Valley Forge*, 454 U.S. at 471, 475. This is especially true here, given the discretionary issues raised by BCC—including waiver and estoppel—that could overcome prudential standing limitations, but not

---

[6] In addition, federal courts sometimes refer to "standing," albeit imprecisely, in reference to litigants' rights under the applicable substantive law. *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474, 479-80 (2006) (holding that the statute under which plaintiff filed his claim required "injuries flowing from a racially motivated breach of [his] own contractual relationship, not someone else's," while noting that the lower court similarly concluded he lacked "'*standing* to assert a [] claim'" under the applicable statute) (emphasis added).

[7] While the Supreme Court in *Lexmark* did away with the zone-of-interest test as a prudential standing requirement, the Fifth Circuit has subsequently held that this decision does not affect the long-standing "prudential requirement that a party must assert its own rights," *Superior MRI Servs., Inc. v. Alliance Healthcare Servs., Inc.*, 778 F.3d 502, 506 (5th Cir. 2015), which is also at issue in this case.

Article III's immutable requirements. *See Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982) ("[N]o action of the parties can confer subject-matter jurisdiction upon a federal court. Thus, the consent of the parties is irrelevant, principles of estoppel do not apply, and a party does not waive the requirement by failing to challenge jurisdiction early in the proceedings.") (internal citations omitted). Accordingly, the Court must assure itself of BCC's standing under Article III before proceeding any further in the adjudication of this dispute.

  A.  *Article III Standing*

  Standing under Article III requires plaintiffs to "demonstrate a 'personal stake' in the suit." *Camreta v. Greene*, 131 S. Ct. 2020, 2028 (2011) (quoting *Summers v. Earth Island Institute*, 129 S.Ct. 1142, 1148–1149 (2009)). To establish such a personal stake for purposes of Article III standing, "a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)) (brackets in original). In reviewing a plaintiff's showing on these requirements "at the summary judgment stage, any 'specific facts . . . set forth by affidavit or other evidence . . . will be taken to be true.'" *McCardell v. U.S. Dep't of Hous. & Urban Dev.*, — F.3d — , No. 14-40955, 2015 WL 4496176, at *5 (5th Cir. July 23, 2015) (quoting *Lujan*, 504 U.S. at 561) (ellipses in original).

  In this case, Merrick challenges BCC's ability to establish the first Article III standing requirement. *See* Merrick's MSJ 19 (arguing that BCC "has not suffered an injury in fact"). Specifically, Merrick asserts that BCC has not suffered an injury in fact, because it has no right to sue under applicable state law for Merrick's alleged breach of the ISO Agreement, which BCC's

wholly-owned subsidiary, BankCard, entered into alone. *See id.* at 14-16. The Court, however, finds this contention inconsistent with the law governing Article III standing.

As an initial matter, Merrick's reliance on state law in support of its Article III standing assertions is unavailing. As the Supreme Court has made clear, "[s]tanding to sue in any Article III court is, of course, a federal question which does not depend on the party's [] standing in state court." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804 (1985) (citations omitted); *see also Hollingsworth v. Perry*, 133 S. Ct. 2652, 2667 (2013) ("[S]tanding in federal court is a question of federal law, not state law."). Similarly, "although federal standing 'often turns on the nature and source of the claim asserted,' it 'in no way depends on the merits of the [claim].'" *ASARCO, Inc. v. Kadish*, 490 U.S. 605, 625 (1989) (quoting *Warth*, 422 U.S. at 500) (brackets in original). Thus, the issues of whether BCC has the right to sue for breach of contract under Utah state law, and whether BCC may bring its subsidiary's claim under Missouri state law, do not control the Article III standing inquiry. Rather, the relevant question here is whether, under existing federal precedent, BCC has "suffered an injury in fact, thus giving [it] a sufficiently concrete interest in the outcome of the issue in dispute." *Hollingsworth*, 133 S. Ct. at 2664 (quotation marks and citation omitted) (brackets added).

Applying these governing federal standards, "[t]he Supreme Court has held . . . that a parent company does have Article III standing on the basis of injury to a subsidiary." *In re Neurontin Mktg. & Sales Practices Litig.*, 810 F. Supp. 2d 366, 369 (D. Mass. 2011) (discussing *Franchise Tax Bd. of Calif. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 335-36 (1990)). As for the real standing concern that Merrick raises here—"the so-called shareholder standing rule . . . that generally prohibits shareholders from initiating actions to enforce the rights of the corporation"—the Supreme Court

found this rule to be a prudential or "equitable restriction" that did not implicate the minimal requirements of Article III standing. *Franchise Tax Bd. of Calif*, 493 U.S. at 336. And while a number of Fifth Circuit decisions appear, at first glance, to hold otherwise, a closer examination shows that none explicitly find standing lacking under Article III, and each decision at least references prudential or substantive law standing grounds as support for its conclusion.[8] Indeed, the one Fifth Circuit decision to explicitly discuss Article III standing in this context held that the principle "that a shareholder may not sue for the corporation's injury does not attack [the] injury in fact" requirement for Article III standing. *Ensley v. Cody Res., Inc.*, 171 F.3d 315, 319-20 (5th Cir. 1999). The Fifth Circuit, in *Ensley*, then went on to conclude that the "significant diminution in the value of [plaintiffs'] shares" constituted a sufficient injury in fact to establish Article III standing. *Id.* at 320.

Likewise, here, it is undisputed that BankCard was a party to the ISO Agreement that Merrick allegedly breached, and that BCC was the parent company and sole shareholder of BankCard from the Agreement's inception. Moreover, BCC submits declarations and other evidence indicating that BankCard suffered significant losses on the ISO Agreement, and that BCC was indirectly damaged as a result. *See, e.g.*, Pl.'s App. Opp'n Merrick's MSJ 9-16, 163-194, 241-59, 348-51. Under governing federal precedent, such losses on the part of BCC are sufficient to show an

---

[8] *See Gregory v. Mitchell*, 634 F.2d 199, 202 (5th Cir. 1981) (relying on Rule 17 and the governing substantive statute in finding no "standing" for plaintiffs to file "suit as shareholders of First Bank of Macon"); *United States v. Acadiana Treatment Sys. Inc.*, 214 F.3d 1350, 2000 WL 634145, at *3-4 (5th Cir. 2000) (unpublished) (finding no "standing" without clarifying whether decision is based on Article III or "the equitable restriction against shareholder suits to redress injuries to a corporation"); *Stevens v. Lowder*, 643 F.2d 1078, 1080 (5th Cir. 1981) (holding that "[a]n action to redress injuries to a corporation cannot be maintained by a shareholder in his own name but must be brought in the name of the corporation," without clarifying whether Article III standing is implicated); *Schaffer v. Universal Rundle Corp.*, 397 F.2d 893, 896 (5th Cir. 1968) (finding no "standing" based on "[t]he general rule," under Texas state law, "that an action to redress injuries to a corporation, whether arising out of contract or tort, cannot be maintained by a stockholder in his own name but must be brought in the name of the corporation").

injury in fact fairly traceable to the breach of contract alleged, and redressable pursuant to a ruling in BCC's favor. Therefore, the Court concludes that BCC has standing under Article III to pursue its breach of contract claim against Merrick.

      B.     *Prudential Standing/Real Party in Interest Under Rule 17(a)*

      "'Prudential standing requirements exist in addition to the immutable requirements of Article III as an integral part of judicial self-government.'" *Superior MRI Servs.*, 778 F.3d at 504 (quoting *St. Paul Fire & Marine Ins. Co. v. Labuzan*, 579 F.3d 533, 539 (5th Cir. 2009)). One such prudential standing requirement is the "'fundamental restriction on [federal judicial] authority' that . . . 'a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties.'" *Hollingsworth*, 133 S. Ct. at 2663 (quoting *Powers v. Ohio*, 499 U.S. 400, 410 (1991)). The Fifth Circuit has held, in a similar context, that this prudential standing requirement is encompassed in Rule 17(a) of the Federal Rules of Civil Procedure.[9] *See Ensley*, 171 F.3d at 320; *see also Pyramid Transp., Inc. v. Greatwide Dallas Mavis, LLC*, No. 3:12-cv-0149-D, 2013 WL 3834626, at *2 (N.D. Tex. July 25, 2013) ("[The Rule 17(a)] requirement is in essence a codification of the prudential standing requirement that a litigant cannot sue in federal court to enforce the rights of third parties.").

      Rule 17(a), much like the limitation on third party standing, provides that "[a]n action must be prosecuted in the name of the real party in interest." FED. R. CIV. 17(a)(1). Moreover, just as "prudential standing arguments may be waived," *Bd. of Mississippi Levee Comm'rs v. U.S. E.P.A.*, 674

---

[9] Therefore, for ease of reference, the Court will focus its analysis on Rule 17 and the precedents thereunder, which the parties focus their dispute on as well. The result would be the same here if the Court focused exclusively on the precedents governing prudential standing instead.

F.3d 409, 417 (5th Cir. 2012) (citation omitted), Rule 17(a) objections may be dismissed as untimely. *See Ensley*, 171 F.3d at 320 (finding that, since the defendant "did not object until after [the plaintiff's] case-in-chief[,] . . . the object is waived") (citations omitted). Rule 17(a) additionally requires that a "court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." FED. R. CIV. P. 17(a)(3).

In this case, Merrick raises mostly the same arguments for dismissing BCC's claim pursuant to Rule 17(a) that it raised in advocating for dismissal under Article III for lack of standing. *See* Merrick's MSJ 20-23. In response, BCC offers three counter-points. *See* Pl.'s Resp. Opp'n Merrick's MSJ 24-27. First, it contends that Merrick has waived its prudential standing and Rule 17(a) arguments by failing to timely object. *See id.* at 24-26. Second, assuming Merrick's objection is found to be timely, BCC maintains that dismissal is inappropriate, because it is the real party in interest under Rule 17(a) and applicable state law. *See id.* at 26-27. Third, in the event "the Court finds that this case has not been prosecuted in the name of the real party in interest," BCC requests in the alternative "that the Court grant a reasonable time to join Bankcard before dismissing this case." *Id.* at 27 n.15. The Court addresses each of these points, in turn, below.

### 1.    Did Merrick Waive its Rule 17(a) Objection?

As a preliminary matter, the parties dispute whether Merrick waived its real-party-in-interest objection by waiting too long to assert it. As mentioned, "[r]eal-party-in-interest issues . . . impose only a 'prudential limitation' on [federal courts] and may be waived by a party's failure to [timely] raise them." *Sch. Bd. of Avoyelles Parish v. U.S. Dep't of Interior*, 647 F.3d 570, 577 (5th Cir. 2011) (citing *Ensley*, 171 F.3d at 320; *In re Signal Int'l, LLC*, 579 F.3d 478, 487-90 (5th Cir. 2009)).

BCC argues that Merrick waived its real party in interest objection by delaying in raising the issue until after the Court denied in part Merrick's Motion to Dismiss. Pl.'s Resp. Opp'n Merrick's MSJ 24. More specifically, BCC claims that Merrick "laid behind the log of its Motion to Dismiss for nearly a year before asserting" the objection in its original answer on September 10, 2014. *Id.* Even then, BCC says that Merrick's original answer did not raise the Rule 17(a) issue directly, but merely asserted vague "standing and privity defenses." *Id.* at 26. Thereafter, BCC notes that Merrick "provided evasive, incomplete answers to BCC's discovery requests concerning its defensive legal theories," and failed to "disclos[e] Bankcard as a person with knowledge until after BCC called it to Merrick's attention in its response to Merrick's original Motion for Summary Judgment." *Id.* at 24. BCC maintains that these delay tactics on the part of Merrick have caused "the parties, and BCC, in the meantime to incur substantial costs and attorney's fees," and therefore, the Court should find Merrick's objection to be waived as untimely. *Id.* at 24-26.

Merrick counters by explaining that its Motion to Dismiss was filed a little over a month after receiving notice of this lawsuit, at which time it "was commencing its investigation into a myriad of issues including the relationship between [BCC and BankCard]." Merrick's Reply 13. Merrick maintains that its failure to raise the defense at that point was, therefore, reasonable, especially given BCC's failure to clearly articulate "its own entity relationships even at this juncture in the case." *Id.* Merrick says that when its subsequent "investigation revealed that [BCC and BankCard] are wholly separate entities," it alerted BCC of its real-party-in-interest defense the first chance it had—in its original answer. *Id.* And if this somehow wasn't enough, Merrick points out that it additionally raised the issue in response to BCC's Third Amended Complaint and Synopsis on September 10, 2014, in its initial Motion for Summary Judgment filed November 11, 2014, and now here again in Merrick's

MSJ that is currently pending. Merrick's MSJ 21-22. Merrick argues in conclusion that these filings are more than enough to show that its real-party-in-interest objection was timely. *See id.* As follows, the Court agrees.

To avoid waiver of a real-party-in-interest defense under Rule 17(a), an "objection must be raised when joinder is practical and convenient." *Rogers v. Samedan Oil Corp.*, 308 F.3d 477, 484 (5th Cir. 2002) (citing *Gogolin & Shelter v. Karn's Auto Imports, Inc.*, 886 F.2d 100, 102 (5th Cir. 1989)). The Fifth Circuit has explained that "[t]here is no magic formula for determining practicality and convenience." and ultimately, the determination will depend "on the facts of each case and is within the discretion of the district court." *In re Signal*, 579 F.3d at 488 (citing 6A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1554). Some factors to consider in making this determination include when the defendant was put on notice of a potential real party in interest dispute, and whether the timing of the defendant's objection was such that the plaintiff had a "meaningful opportunity to prove its status" or join the real party in interest. *Id.* An objection may be "inconvenient," for instance, "when it hinders the 'goal of judicial efficiency' or manifests the defendant's intention to 'lay behind the log' in ambush." *Id.* (citing *Rogers*, 308 F.3d at 484; *Gogolin & Shelter*, 886 F.2d at 102).

Here, the Court finds, in its discretion, that Merrick's objection to BCC's status as the real party in interest was not waived on timeliness grounds. Despite BCC's suggestions that Merrick "laid behind the log of its Motion to Dismiss," Merrick shows that it quite reasonably was investigating the real party in interest issue at the time its Motion to Dismiss was filed, at which point Merrick had only been aware of the lawsuit itself for a little over a month. This minor delay seems even more reasonable given BCC's ongoing inability to clearly articulate its relationship with the purported real

party in interest, BankCard. *See, e.g.*, Pl.'s Resp. Opp'n Merrick's MSJ 22 (arguing, first, that BankCard is BCC's subsidiary as shown by the transfer of "all of its stock to [BCC] in 2007," and second, that BankCard "thereafter" became a mere "trade name" of BCC). Once it had all the facts it needed to raise its real-party-in-interest objection, Merrick did so in its first pleading filed in this case. While Merrick arguably could have put forth this objection sooner, the Court finds no support for the contention that Merrick thereby waived its objection by waiting to see how its first motion to dismiss played out, or by not later filing a second motion to dismiss. Indeed, existing authorities suggest that the real party in interest objection is appropriately raised in the defendant's answer. *See Gogolin & Shelter*, 886 F.2d at 102 (citing WRIGHT ET AL., *supra*, § 1554 for the proposition that a Rule 17(a) objection should "be raised in responsive pleadings").

Moreover, the Court rejects BCC's argument that Merrick's assertions in its original answer were not sufficient to constitute a Rule 17(a) objection. While Rule 17(a) is not entirely clear as to what qualifies as an objection,[10] the Fifth Circuit has explained that the rule contemplates one that allows "the real party in interest . . . to step forward and assume the plaintiff's role." *Id.* And here, Merrick's allegations in its original answer gave sufficient notice of its position that BankCard must step forward as the real party in interest and assume BCC's role for the breach of contract claim to succeed. In particular, Merrick alleged that BCC's breach of contract claim was "barred and precluded by the lack of privity between Merrick and [BCC]," and "by [BCC's] lack of standing, as the Merchant ISO Agreement is between Merrick and BankCard Central, Inc." Doc. 98, Def. Merrick's Answer at 16, ¶¶ 3, 4. These allegations quite clearly convey Merrick's objection. And

---

[10] *See* Wright et al. § 1554 (explaining that "[t]he federal rules do not contain a specific procedure for raising an objection that plaintiff is not the real party in interest").

since they were asserted in a timely fashion, the Court finds that Merrick did not waive its Rule 17(a) objection.

Last, and for good measure, the Court finds in the alternative that Merrick's Rule 17(a) objection in its first motion for summary judgment brief, on November 17, 2014, was timely as well. Assuming *arguendo* that Merrick's allegations in its original answer do not constitute an objection, its assertions in its first motion for summary judgment clearly do. *See* Doc. 126, Merrick's First Mot. Summ. J. 12 (citing Rule 17(a) in support of its contention that BCC "is not a real party in interest with standing to sue for breach of the Merchant ISO Agreement"). Furthermore, the Court already found Merrick's allegations in its original answer to be timely under Rule 17(a), and there is no evidence that Merrick's two month delay in re-asserting its objection was a dilatory tactic. Additionally, after scheduling issues prompted the Court to dismiss Merrick's first motion for summary judgment without prejudice, BankCard still had nearly five months to ratify, join, or be substituted into this action before Merrick re-asserted the issue in its now pending MSJ. Under similar circumstances, another court in this District found a Rule 17(a) objection to be timely. *See Pyramid Transp., Inc. v. Greatwide Dallas Mavis, LLC*, No. 3:12-CV-0149-D, 2013 WL 3834626, at *4 (N.D. Tex. July 25, 2013) (Fitzwater, C.J.) (finding no waiver of Rule 17(a) objection first asserted at summary judgment, since the defendant raised it "soon after learning" of the plaintiff's contested status and at a time in which the real party in interest could, "if he so desire[d], ratify, join, or be substituted into [the] action"). Moreover, these circumstances make this case much different than the Fifth Circuit opinions that BCC relies on, where the Rule 17(a) objection was first raised

during or on the eve of trial.[11] For these reasons, the Court rejects BCC's contention that Merrick

waived its Rule 17(a) objection, and instead concludes that Merrick timely objected.

2.        Is BCC the Real Party in Interest?

Having determined that it may consider Merrick's objection, the Court turns now to BCC's

next responsive contention, which is that BCC is indeed the real party in interest "entitled to enforce

the ISO Agreement." Pl.'s Resp. Opp'n Merrick's MSJ 26. As mentioned, Rule 17(a) requires that

claims "be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a). "The real party

in interest is the person with the right to sue under substantive law, and the determination whether

one is the real party in interest with respect to a particular claim is based on the controlling state or

federal substantive laws." *BAC Home Loans Servicing, LP v. Texas Realty Holdings, LLC*, 901 F. Supp.

2d 884, 907 (S.D. Tex. 2012) (citing *In re Davis*, 194 F.3d 570, 578 (5th Cir. 1999); *Farrell Constr.*

*Co. v. Jefferson Parish, La.*, 896 F.2d 136, 140 (5th Cir. 1990)). As the parties agree, Utah law

governs the question of whether BCC has a right to sue for Merrick's alleged breach of the ISO

Agreement. *See* July 28, 2014 Order at 6 (noting the parties' agreement that disputes arising from

the ISO Agreement are governed by Utah state law). Also undisputed is the fact that Missouri law,

under which BCC and BankCard are incorporated, controls the question of whether BCC may bring

a claim on behalf of its wholly-owned subsidiary, BankCard. *See* Fed. R. Civ. P. 17(b)(2) ("Capacity

to sue or be sued is determined . . . for a corporation, by the law under which it is organized.").

---

[11] *See Ensley*, 171 F.3d at 320 (finding objection waived on timeliness grounds, where it was not raised "until after [the plaintiff's] case-in-chief"); *In re Signal*, 579 F.3d at 489 (agreeing with district court that objection was untimely, where the defendant "did not challenge [the plaintiff's] status as the real party in interest until the eve of trial"); *Gogolin & Shelter*, 886 F.2d at 102 ("Surely it is inconsistent with [Rule 17(a)] to raise a real party in interest defense for the first time on motion for directed verdict."); *Rogers*, 308 F.3d at 482-83 (finding objection untimely where it was "raised . . . for the first time on the eve of trial").

Merrick argues that BCC is not the real party in interest entitled to sue for breach of the ISO Agreement, because the Agreement plainly shows that BankCard—the wholly-owned subsidiary of BCC—entered into the Agreement alone. Merrick's MSJ 21. Relying on Utah state law,[12] Merrick explains first that BCC has no right of its own to sue for the alleged breach under these circumstances, since it is "neither a party nor a third-party beneficiary to the ISO Agreement, and no assignment of the relevant claims is pled or possible." *Id.*; *see also id.* at 14-16. Next, under Missouri law,[13] Merrick additionally shows that BCC cannot bring a claim on behalf of its subsidiary in these circumstances, and thereby "pierce its own corporate veil and disregard its separate corporate existence." *Id.* at 16. "As a consequence," Merrick contends, "[BCC] is not the real party in interest with respect to [the breach of contract] clai[m] asserted against Merrick." *Id.* at 21.

In response, BCC does not directly contest any of the above assertions made by Merrick. Instead, BCC offers two novel theories as to why the Court should find there to be a genuine dispute regarding its right to enforce the ISO Agreement. *See* Pl.'s Resp. Opp'n Merrick's MSJ 17-24, 26-27. The first is that "Merrick is estopped to deny the existence of a contract with BCC" under a theory of contract by estoppel recognized in Utah. *Id.* at 27. Alternatively, BCC claims that it is "entitled to enforce the ISO Agreement in its own name under Utah law as the undisclosed principal of [BankCard]." *Id.* at 26. The Court considers each of these theories below.

---

[12] *See City of Grantsville v. Redevelopment Agency of Tooele City*, 233 P.3d 461, 466 (Utah 2010) ("[W]ith the exception of those who are third-party beneficiaries or assignees, only those who are a party to a contract have a legally protectable interest in that contract [for purposes of establishing standing].").

[13] *See Doe 1631 v. Quest Diagnostics, Inc.*, 395 S.W.3d 8, 18 (Mo. 2013) ("[G]enerally a parent company is not responsible for the acts of its subsidiary corporation and . . . [the] parent/subsidiary separation should be ignored with caution, and only when the circumstances clearly justify it.") (citation and quotation marks omitted).

*i.*        *BCC's equitable estoppel theory*

The Utah Supreme Court recognizes equitable estoppel as a viable defense[14] in the context of breach of contract claims. *See Youngblood v. Auto-Owners Ins. Co.*, 158 P.3d 1088, 1092 (Utah 2007) ("Our caselaw recognizes equitable estoppel . . . as [a] distinct legal principl[e] [and] a defense . . . in most instances."). Utah courts generally apply the doctrine of equitable estoppel to remedy "circumstances where it is not fair for a party to represent facts to be one way to get the other to agree, and then change positions later to the other's detriment." *Id.* For example, the doctrine has been asserted "to enlarge the scope of an insurance policy's coverage where the company's agent materially misstates the scope of coverage prior to the purchase of the policy." *Id.* at 1090. Similarly, the doctrine has been used to estop the holder of a promissory note from seeking payment from the note's makers, who in reliance on the holder's representations, mistakenly directed payments to the note's "soon-to-be-bankrupt" originator. *See Glew v. Ohio Sav. Bank*, 181 P.3d 791, 792 (Utah 2007).

Under Utah law, the party seeking to prevail on "a claim of equitable estoppel . . . must establish three elements." *Salt Lake City Corp. v. Big Ditch Irrigation Co.*, 258 P.3d 539, 548 (Utah 2011). These elements include:

> (1) a statement, admission, act, or failure to act by one party inconsistent with a claim later asserted, (2) reasonable action or inaction by the other party taken or not taken on the basis of the first party's statement, admission, act or failure to act, and (3) an injury to the second party that would result from allowing the first party to contradict or repudiate such statement, admission, act, or failure to act.

---

[14] Because equitable estoppel is generally a defensive theory, and BCC asserts it in response to Merrick's pleaded defenses that required no responsive pleading, BCC is permitted to argue this theory even though it was not pled. *See* Fed. R. Civ. P. 12(b) ("Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. . . . If a pleading sets out a claim for relief that does not require a responsive pleading, an opposing party may assert at trial any defense to that claim.").

*Meadow Valley Contractors, Inc. v. State Dep't of Transp.*, 266 P.3d 671, 683 (Utah 2011) (citing *Youngblood*, 158 P.3d at 1092; *Nunley v. Westates Casing Servs., Inc.*, 989 P.2d 1077, 1088 (Utah 1999)) (quotation marks omitted).

    BCC claims that a genuine dispute exists with respect to each of these elements of estoppel as applied to the facts of this case. *See* Pl.'s Resp. Opp'n Merrick's MSJ 17. Regarding the first element, BCC contends that "Merrick has recognized its contractual relationship with BCC multiple times" during the course of the ISO Agreement's performance. *Id.* at 18-19. In support, BCC points to a "Merchant Portfolio Assignment and Assumption Agreement" signed by Merrick that indicates the ISO Agreement is between BCC and Merrick, Richard Nobel's affidavit claiming that he informed Merrick's Vice President Fred Horn of BCC's and BankCard's corporate restructuring and Mr. Horn assured him there was no "need to adopt formal changes to their contractual arrangement," billing statements Merrick sent to BCC that reflect "the services JetPay provided for BCC's merchants under the [MSA]," and an email from Merrick's general counsel in January 2013 notifying BCC of Merrick's intentions to invoke its contractual rights "'pursuant to section 1.3 of our Merchant ISO Agreement with BCC.'" *Id.* at 18-19. Second, BCC maintains that the second estoppel element is also satisfied, because BCC reasonably relied on Merrick's statements in failing to request and execute "an addendum reflecting BCC's corporate structure change," and failing to execute or amend merchant and other third party agreements to reflect BCC's role. *Id.* at 19-20. Third, BCC lastly contends that the third element is met here as well, arguing that BCC will be unable to collect on its breach of contract allegations "if the Court permits Merrick to deny the

existence of a contractual relationship with BCC."[15] *Id.* at 20.

Merrick argues in reply that BCC "has not established the necessary elements of estoppel" for a number of reasons.[16] Merrick's Reply 5. Merrick first claims that all of the Utah authorities that BCC relies on apply equitable estoppel where "the extrinsic representations made to the plaintiff, upon which he relied, were made to the plaintiff before he entered the contract." *Id.* But in this case, Merrick contends, BCC "has not alleged a single representation by Merrick prior to execution of the ISO Agreement," and therefore, the equitable estoppel defense must fail at both the first and second elements. *Id.* at 6 & 3.  In addition, Merrick posits that BCC's equitable estoppel claim fails at the third element, because BCC "has simply not been damages by action of Merrick." *Id.* at 6. In essence, Merrick says that BCC's damages contentions amount to nothing more than a complaint that "Richard Nobel will be forced to restart his litigation against Merrick." *Id.* Therefore, Merrick argues that the Court should conclude that summary judgment is proper with respect to BCC's equitable estoppel claim. *Id.* at 7. For the reasons that follow, the Court concludes that Merrick's position is

---

[15] As a final attempt to prove estoppel here, BCC additionally asserts that it "would be damaged by the loss of its tort claims against Merrick should Merrick's argument succeed" because of allegedly inconsistent representations Merrick made in its Motion to Dismiss, which BCC believes "serves as an independent basis to estop Merrick from denying its contract with BCC." Pl.'s Resp. Opp'n Merrick's MSJ 21 & n.11. This argument, however, is one for judicial estoppel, which BCC has not explicitly raised. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("This rule, known as judicial estoppel, generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.") (citation and quotation marks omitted). Since BCC has made no effort to establish that judicial estoppel, as distinguished from equitable estoppel under Utah state law, is applicable in this case, the Court declines in its discretion to address these assertions any further. *See id.* at 750 ("Because the rule is intended to prevent improper use of judicial machinery, judicial estoppel is an equitable doctrine invoked by a court at its discretion.") (citations and quotation marks omitted).

[16] Merrick additionally argues that estoppel "is irrelevant" in the context of standing. Merrick's Reply 4. But while this may be correct for Article III standing, Merrick cites no authority for the proposition that the same is true when evaluating a real party in interest objection under Rule 17(a).

more consistent with the governing law here.

First, BCC's equitable estoppel claim fails initially at the first element, because there is no evidence that Merrick's prior statements, actions, and inactions warrant the equitable doctrine's application. The Utah Supreme Court has explained that the whole point of "estoppel is 'to rescue from loss a party who has, without fault, been *deluded* into a course of action by the *wrong* or *neglect* of another.'" *Big Ditch Irrigation*, 258 P.3d at 548 (quoting *Morgan v. Bd. of State Lands*, 549 P.2d 695, 697 (Utah 1976)). To that end, "application of estoppel is [generally] reserved for instances of wrongdoing by the estopped party . . . , and only when necessary to avoid injustice." *Id.* (citations omitted). In accordance with these principles, Utah courts hold that equitable estoppel's first element requires both proof of an inconsistency and evidence that "the party sought to be estopped has *intentionally* or through *culpable negligence* induced the other party to change its position by relying on the inconsistent act." *Id.* (collecting cases) (emphasis added).

In this case, even assuming Merrick's alleged representations or actions are inconsistent with its present position, BCC has not shown Merrick's conduct in this regard was intentional or the product of culpable negligence. At worst, the purported inconsistencies are attributable to Merrick's failure to fully comprehend the confusing manner in which Richard Nobel chose to run his business—through two separate entities while interchangeably using the two entity names—and his decision to subsequently sue on behalf of BCC without ever joining BankCard to this suit. These circumstances simply do not show that Merrick was culpably negligent in bringing about BCC's actions and inactions. Nor do they present the sort of "injustice" for which estoppel is reserved. For these reasons alone, BCC's estoppel claim fails. *See Big Ditch Irrigation*, 258 P.3d at 548; *Almon, Inc. v. Utah Liquor Control Comm'n*, 696 P.2d 1210, 1214-15 (Utah 1985) (declining to apply equitable

estoppel where the party opposing estoppel merely failed "to forsee" and "correct a misconception" arising from its statements and conduct).

Second, BCC's estoppel claim is also deficient at the second element, as BCC has not shown that it reasonably relied on Merrick's prior statements, actions, or inactions. As part of the second element of equitable estoppel, Utah courts require that "a party's [action or] inaction *be induced by* another party's statement, act, or failure to act." *Meadow Valley Contractors*, 266 P.3d at 684 (citing *Youngblood*, 158 P.3d at 1092) (emphasis in original). Moreover, to the extent a party is induced to change positions in reliance of the statements, actions, or inactions at issue, its reliance must be "reasonable." *IHC Health Servs., Inc. v. D&K Mgmt., Inc.*, 73 P.3d 320, 324 (Utah 2003) (holding that landlord's acquiescence in a single late payment by the tenant was "insufficient to justify [tenant's] alleged reliance on [landlord's] failure to enforce the forfeiture provision of the lease").

Here, BCC has not shown that it was induced to change positions or that it did so "reasonably." BCC claims that it is now in a position where it has to defend against a real party in interest objection because of Merrick's statements and inactions, but it was BCC's own CEO, Richard Nobel, who made this an issue to begin with. Merrick took no part in Mr. Nobel's unilateral decisions to run his business through two separate corporate entities, to use "BankCard" and "BCC" interchangeably while intermingling employees and accounts, or to enter into the ISO Agreement in BankCard's name alone. And to the extent BCC relied on any of Merrick's conduct, it offers no explanation as to why BCC decided not to seek an amendment to the ISO Agreement, or at the very least, to join BankCard in this suit. Such confounding decisions, supposedly in reliance of Merrick's statements and actions, fail to satisfy the "reasonableness" standard for equitable estoppel.

Lastly, the Court additionally finds that BCC has failed to demonstrate detrimental reliance

for purposes of its equitable estoppel claim. BCC cannot lose anything as a result of this ruling, because it never had any rights under the ISO Agreement to begin with. Under Utah law, equitable estoppel is typically used as a "shield," not a "sword" capable of creating a cause of action. *Youngblood*, 158 P.3d at 1093 (citing *Humetrix, Inc. v. Gemplus S.C.A.*, 268 F.3d 910, 918 (9th Cir. 2001)). And here, BCC asks the Court to use its equitable powers to carve out a cause of action it would not otherwise be entitled to bring, all because of its own missteps in running its business and pursuing its claims against Merrick. The Court finds such an application of the equitable estoppel doctrine to be inconsistent with Utah law. As such, it concludes that BCC has failed to carry its burden of creating a genuine issue of material fact for its equitable estoppel claim.

*ii.      BCC's undisclosed principal theory*

As a second theory regarding its status as a real party in interest, BCC asserts that BankCard signed the ISO Agreement in an agency capacity on BCC's behalf. Pl.'s Resp. Opp'n Merrick's MSJ 26. Though the ISO Agreement does not mention BCC or indicate that BankCard signed the Agreement as an agent, BCC claims that it, nonetheless, qualifies as an undisclosed principal entitled to enforce the Agreement under Utah law. *See id.*

It is true that BCC would be entitled to sue as an undisclosed principal to the ISO Agreement under Utah law, so long as BCC could establish that BankCard was acting agent when it signed the ISO Agreement, and that BankCard was acting within the scope of its agency authority at the time. *See Garland v. Fleischmann*, 831 P.2d 107, 110 (Utah 1992) ("It is well established in the law that a principal is liable for the acts of his agent within the scope of the agent's authority, irrespective of whether the principal is disclosed or undisclosed."). But as Merrick correctly points out in its reply, BCC's newly-raised agency theory need not be considered at this late juncture in the proceedings.

In the Fifth Circuit, district courts have discretion to "'disregard claims or theories of liability not present in the complaint and raised first in a motion opposing summary judgment.'" *GlobeRanger Corp. v. Software AG*, 27 F. Supp. 3d 723, 754 (N.D. Tex. 2014) (quoting *De Franceschi v. BAC Home Loans Servicing, L.P.*, 477 Fed. Appx. 200, 204 (5th Cir. 2012) (unpublished)). This rule is founded on the principle that a defendant is entitled, from the pleadings stage and onward, to "'fair notice of what the claim is and the grounds upon which it rests.'" *DeFranceschi*, 477 Fed. Appx. at 204 (quoting *Ashcroft v. Iqbal*, 566 U.S. 662, 698-99 (2009)). Thus, a theory or "claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court." *Cutrera v. Bd. of Sup'rs of Louisiana State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) (citing *Fisher v. Metropolitan Life Ins. Co.*, 895 F.2d 1073, 1078 (5th Cir. 1990)).

Here, the Court, in its discretion, rejects BCC's undisclosed principal theory, which was raised for the first time in opposition to Merrick's MSJ. BCC's pleadings are devoid of any allegations suggesting that BCC's rights under the ISO Agreement arise from its agency relationship with BankCard. Instead, BCC's Third Amended Complaint merely states that "BCC and Merrick entered into . . . a Merchant ISO Agreement," without ever mentioning BankCard or its purported role as BCC's agent. Doc. 90, Third. Am. Compl. ¶ 13. In addition, there is no evidence that BCC ever notified Merrick of its undisclosed principal theory prior to its response to Merrick's MSJ.[17] In fact, Merrick shows that in a Rule 30(b)(6) deposition on BCC's behalf, Richard Nobel testified that "BankCard Central, Inc. and BCC Merchant Solutions, Inc. are the same thing," which contradicts BCC's current position that the two entities separately act as agent and principal. Merrick's Reply

---

[17] This includes BCC's response to Merrick's first motion for summary judgment (doc. 148), which made no mention of BCC's newly-asserted undisclosed principal argument.

10. Merrick, therefore, has been left without fair notice to mount a defense against BCC's last-minute agency assertions. As such, the Court, in its discretion, declines to entertain BCC's unpled theory. *See Orthoflex, Inc. v. ThermoTek, Inc.*, 983 F. Supp. 2d 866, 873 (N.D. Tex. 2013) (declining to consider new theories supporting breach of contract claim raised for the first time in opposition to summary judgment).

To summarize, BCC has not shown itself to be the real party in interest under either an estoppel or agency law theory. Nor has BCC disputed Merrick's evidence showing that only BankCard is entitled to enforce the ISO Agreement against Merrick, and that BCC cannot pierce the corporate veil of its subsidiary to bring BankCard's breach of contract claim. Accordingly, the Court concludes that BCC has failed to create a genuine issue of material fact with respect to its status as the real party in interest entitled to sue for Merrick's alleged breach of the ISO Agreement.

### 3.     Should the Court Grant BCC Leave to Join or Substitute BankCard?

Now that it has been established that BCC is not the real party in interest under the ISO Agreement, the Court must consider whether to grant BCC leave to join or substitute BankCard as the real party in interest under Rule 17(a). As mentioned, Rule 17(a) limits this Court's discretion to "dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." FED. R. CIV. P. 17(a)(3). Nonetheless, courts have held that this language places the burden on the "plaintiff who is not the real party in interest [to] show . . . that he did not have a reasonable time to correct the pleading deficiency." *Wieburg v. GTE Sw., Inc.*, 71 Fed. Appx. 440, 2003 WL 21417074, at *2 (5th Cir. June 2, 2003) (unpublished) (citing *Wieburg v. GTE Sw. Inc.*, 272 F.3d 302, 308 (5th Cir. 2001); WRIGHT ET AL., *supra*, § 1555). In addition, the

- 25 -

Fifth Circuit, "[i]n accord with advisory committee notes, . . . has put gloss on Rule 17's unqualified language," holding that "a plaintiff must have a reasonable basis for naming the wrong party to be entitled to ratification, joinder, or substitution." *Magallon v. Livingston*, 453 F.3d 268, 273 (5th Cir. 2006) (citing *Wieburg*, 272 F.3d at 308). Whether to grant or deny leave pursuant to Rule 17(a) is generally left to the "discretion" of the district court. *Wieburg*, 272 F.3d at 308 (citations omitted).

Merrick argues that the Court should deny BCC leave under Rule 17(a), because it cannot meet its burden of showing that its failure to join BankCard was based on a reasonable or understandable mistake, or that it did not have a reasonable time to correct this deficiency. *See* Merrick's MSJ 22-23. Despite Merrick's citation and discussion of Fifth Circuit case law placing the burden on plaintiffs to show they are entitled to leave, BCC responds with a single-sentence footnote that summarily "requests that the Court grant a reasonable time to join BankCard before dismissing this case." Pl.'s Resp. Opp'n Merrick's MSJ 27 n.5. The Court, in its discretion, declines to grant BCC leave on the basis of such a lackluster showing.

Left without an explanation from BCC, the Court has no reason to find that BCC's failure to join BankCard—its own subsidiary—constitutes a "reasonable" or "understandable" mistake. *See Delor v. Intercosmos Media Grp., Inc.*, 232 F.R.D. 562, 567 (E.D. La. 2005) (denying leave because "plaintiff simply cannot maintain that he brought this action in his own name due to an honest and understandable mistake") (emphasis omitted); *In re Enron Corp. Secs., Derivative & ERISA Litig.*, 279 F.R.D. 395, 412 (S.D. Tex. 2011) (denying leave where plaintiffs "did not make an honest or 'understandable' mistake under Rule 17"); *Isbell v. DM Records, Inc.*, No. 4:07-cv-146, 2009 WL 792415, at *1 (E.D. Tex. Mar. 24, 2009) (denying leave, because plaintiff's "mistake . . . was not reasonable," as "it should have been clear whose action this was"); *Triple Tee Golf, Inc. v. Nike, Inc.*,

No. 4:04-cv-302-A, 2007 WL 4260489, at *26 (N.D. Tex. Aug. 10, 2007) (finding "plaintiff cannot show that it sued in its own name based on an understandable mistake," because, "for whatever reason, plaintiff made a calculated decision to pursue this action in its own name . . . notwithstanding knowledge that it did not have a legal right to do so").

Nor does the Court believe that BCC was deprived of a "reasonable" amount of time, following Merrick's objection, to allow BankCard to join, ratify, or be substituted into this action. FED. R. CIV. P. 17(a)(3). The Court is at a loss to understand BCC's strategy in opposing Merrick's real party in interest defense, when it seemingly could have avoided the issue altogether eight months before Merrick re-asserted the objection. Eight months notice is more than reasonable, making BCC's last-ditch effort—buried in a throw-away footnote in its summary judgment brief—unavailing. See Wieburg, 2003 WL 21417074, at *2 (finding "[s]even months is more than reasonable" for plaintiff to have sought leave pursuant to Rule 17(a)); Triple Tee Golf, 2007 WL 4260489, at *26 ("[P]laintiff had much more than a reasonable time to correct the deficiency its complaint suffers by reason of plaintiff's lack of standing to bring this action, [but] it consciously chose not to do so notwithstanding repeated reminders over the years since this action was instituted that defendants did not accept, and were questioning, plaintiff's standing to institute and pursue the action."); Lexxus Int'l, Inc. v. Loghry, 512 F. Supp. 2d 647, 661 (N.D. Tex. 2007) (denying leave, in part, because "interested parties have had more than ample time to obtain joinder, ratification, or substitution of . . . the real party in interest").

Finally, the Court further notes that BCC's request for leave to join BankCard came well after the expiration of the Court's scheduling order deadline to move for leave to join parties. See Doc. 22, Scheduling Or. (setting August 1, 2013 as "Deadline for Motions for Leave to Join Parties or Amend

Pleadings"). In such circumstances, courts have held that plaintiffs must show "good cause" under Rule 16(b)(4), notwithstanding Rule 17(a)(3). *See, e.g., Jasper Wood Products, LLC v. Jordan Scrap Metal, Inc.*, No. CIV.A. 13-0407-WS-C, 2014 WL 3720530, at *6 (S.D. Ala. July 25, 2014) ("[P]laintiff has made no showing and advanced no legal argument that the provisions of Rule 17(a)(3) would allow it to disregard Scheduling Order deadlines with impunity or override the 'good cause' requirement of Rule 16(b)(4)."); *U.S. Steel Corp. v. Scheuerle Fahrzeugfabrik GmbH*, No. 2:07 CV 305, 2010 WL 4318657, at *1 (N.D. Ind. Oct. 25, 2010) ("Without the ability to show good cause to amend the scheduling order under Rule 16(b)(4), the court need not reach the [Rule 17(a) motion presented]."). Since BCC made no effort to show "good cause" for asserting its request for leave more than a year after the scheduling order deadline expired, the Court declines to grant BCC leave to join BankCard under Rule 16(b)(4) as well.

In conclusion, while BCC may have Article III standing, the Court finds that it lacks prudential standing and is not the real party in interest entitled to enforce the ISO Agreement, which BCC's subsidiary, BankCard, undisputedly entered into alone. And since BCC asked for leave to join BankCard in a single-sentence footnote more than eight months after the objection was raised, the Court, in its discretion, declines to allow BCC to delay these proceedings any further by joining or substituting BankCard at this late stage. Accordingly, the Court concludes that BCC's remaining breach of contract claim against Merrick should be dismissed.

## IV.

## JETPAY'S & VOIGT'S MSJ

The Court turns next to Defendants JetPay's and Voigt's MSJ, which seeks to dismiss BCC's

- 28 -

five Texas state law claims brought against them.[18] These claims include: three tort actions filed jointly against JetPay and Voigt (jointly referred to hereinafter as "Defendants") for (1) common law fraud, (2) fraud by nondisclosure, and (3) negligent misrepresentations; a tort-based claim against JetPay individually for (4) Texas Deceptive Trade Practices Act ("DTPA") violations; and another claim against JetPay individually for (5) breach of contract. *See* Third Am. Compl. ¶¶ 63-89.

Defendants cite ten different grounds on which they believe that summary judgment should be granted as to all or part of BCC's five claims. *See* JetPay's & Voigt's MSJ 4-5. They have also filed objections and a motion to strike in relation to the summary judgment evidence offered by BCC. *See* Doc. 222, Defs. JetPay's & Voigt's Objections & Mot. Strike Pl.'s Exs. ("Defs. Objections & Mot. Strike"). In wading through all of this, the Court's discussion, below, will proceed as follows: (a) a brief background discussion to give context to the parties' contentions, (b) a quick review of two preliminary matters raised by Defendants, (c) an analysis of the economic loss rule as applied to BCC's four tort-based claims, and (d) an analysis of BCC's breach of contract claim, including evidence of JetPay's alleged breach and BCC's damages.

A.    *Background*

Unlike Merrick, JetPay and Voigt have not filed any dispositive motions prior to this stage of the proceedings; thus, the Court has not, until now, discussed the relevant background facts to BCC's dispute with JetPay and Voigt.

---

[18] For reference, the parties' filings relevant to JetPay's and Voigt's MSJ (doc. 180), as cited herein, include: Doc. 181, Defs. JetPay's & Voigt's Br. Supp. Mot. Summ. J. (hereinafter, "JetPay's & Voigt's MSJ"); Doc. 182, Defs. JetPay's & Voigt's App. Supp. Mot. Summ. J. (hereinafter, "JetPay's & Voigt's App."); Doc. 215, Pl.'s Br. Supp. Resp. Opp'n Defs. JetPay's & Voigt's Mot. Summ. J. (hereinafter, "Pl.'s Resp. Opp'n JetPay's & Voigt's MSJ"); Doc. 216, Pl.'s App. Supp. Resp. Opp'n Defs. JetPay's & Voigt's Mot. Summ. J. (hereinafter, "Pl.'s App. Opp'n JetPay's & Voigt's MSJ"); and Doc. 220, Defs. JetPay's & Voigt's Reply Supp. Mot. Summ. J. (hereinafter, "JetPay's & Voigt's Reply").

BCC's and JetPay's dispute ultimately derives from the Master Service Agreement (the "MSA") the two entities executed on January 31, 2012. *See* JetPay's & Voigt's App. 1-25, Ex. A (herein after, "MSA"). Before this time, BCC and BankCard had been serving as an ISO for Merrick since November 10, 2008, when the ISO Agreement was first executed.[19] Pursuant to the ISO Agreement, BCC was permitted to hire certain approved third party service providers, who would be responsible for providing Merrick and BCC's merchant customers with credit card processing and data capture services. BCC initially selected CardWorks Processing, Inc. ("CardWorks") and TSYS Acquiring Solutions ("TSYS") as its third party services providers. Pl.'s App. Opp'n JetPay's & Voigt's MSJ 5. In late 2011, however, CardWorks and TSYS closed their processing platforms, forcing BCC to find new a provider. *Id.* at 6-7.

Thus, BCC began considering Merrick's other approved third party service providers, including JetPay. *See id.* at 7. In addition to Merrick's assurances, BCC alleges that it was drawn to JetPay by its advertisements representing that it offered "first class customer support" and "expertise in advising and delivering optimal payment solutions tailored to the specific and unique needs of each customer." Third Am. Compl. ¶¶ 23-25. So, in the fall of 2011, BCC's CEO Richard Nobel decided to meet with JetPay and its president, Defendant Trent Voigt. Pl.'s App. Opp'n JetPay's & Voigt's MSJ 7. At that meeting, Nobel detailed the specific capabilities and services that BCC would need JetPay to provide as BCC's third party service provider. *Id.* According to Nobel, Voigt responded by "affirm[ing] that JetPay had the ability to provide all of these services and was currently providing such services in its business." *Id.* Nobel says that Voigt further represented to him "that

---

[19] For ease of reference, the Court in this factual discussion, at times, refers to services BCC performed pursuant to the ISO Agreement. In reality, BCC was not in privity with Merrick, and these references made for the sake of simplicity should not be construed as a finding to the contrary.

JetPay could easily duplicate the files that CardWorks Processing was supplying for BCC's daily balancing and reporting," and that JetPay had and could provide a "'state-of-the-art merchant reporting system," an "industry leading transaction processing platform," an "automated merchant boarding system" and "portal," a "transaction clearing and settlement system able to process BCC transactions without incident," and systems capable of providing "daily merchant and transaction data of the same nature, character and completeness as previously provided to BCC by CardWorks [and TSYS]." *Id.* at 7-8.

Based on the above representations, BCC claims that it entered into the MSA with JetPay on January 31, 2012. *Id.* at 8. The MSA provided that JetPay would perform a number of services "on behalf of [BCC]," including transaction authorization and data capture, chargeback processing, data entry, daily transaction reporting, customer service, merchant training and equipment services, and other services at JetPay's "written election." *See* MSA § 2. JetPay further agreed to "exercise commercially reasonable care and diligence" in the performance of its "services contemplated by [the MSA]." *Id.* § 6.3. In return, BCC agreed to pay JetPay "the fees and other charges set forth in" schedules attached to the MSA. *Id.* § 4.2. The MSA further provided a process by which BCC could withhold payment "subject to a bona fide dispute," and resolve any such disputes. *Id.* § 4.3. It also allowed either party to terminate the MSA under certain conditions and subject to the processes set forth therein. *See id.* § 5.

Thereafter, BCC says that it experienced a multitude of problems with JetPay's services. Pl.'s App. Opp'n JetPay's & Voigt's MSJ 9-10. Supported by averments, deposition testimony, and emails, BCC claims that JetPay failed in a variety of ways to process merchant transactions, accurately report transactions, and service BCC's merchant customers, along with other issues. *See id.* at 9-18, 183-84,

203-11, 256-85, 302-03, 306-14. These problems caused BCC's offices to be flooded with calls from unhappy merchants starting as early as February 2012. *Id.* at 10. BCC began requesting immediate action from JetPay to remedy the problem, and thereafter communicated the various issues BCC and its merchant customers were experiencing. *See, e.g.*, *id.* at 11, 183-84, 206-07, 262-78. When nothing came from these communications, BCC says that its staff was enlisted to troubleshoot and resolve the issues that JetPay had caused and failed to correct. *See id.* at 11-12. BCC's staff even traveled to JetPay's offices in Dallas to help resolve these issues and to oversee a remediation project. *Id.* at 12.

In July 2014, Nobel traveled to JetPay's offices to meet with Voigt and JetPay's representatives regarding the issues BCC was continuing to experience. *See id.* at 13, 203-05. At that time, Nobel informed Voigt that BCC would not pay JetPay's invoices "until the outstanding issues with JetPay's performance were resolved." *Id.* at 13. Voigt agreed to this arrangement, and re-affirmed that JetPay would be able to fix BCC's issues moving forward. *See id.* at 13-14. As a result of these and other assurances from JetPay, BCC alleges that it refrained from terminating the MSA. *See* Third Am. Compl. ¶¶ 33-34, 74, 79.

BCC claims that it continued to suffer problems due to JetPay's inadequate services up until JetPay "ceased processing card transactions for BCC's merchants at or near the end of February 2013." Pl.'s App. Opp'n JetPay's & Voigt's MSJ 10. Right before JetPay's services were terminated, in January 2013, JetPay reached out to Merrick and demanded payment of a $100,000 invoice that BCC refused to pay, with the threat that JetPay would discontinue services for merchant accounts if the invoice remained unpaid. *Id.* at 231-32. After notifying BCC, who strongly objected, Merrick complied with JetPay's demands and paid the $100,000 disputed fee from funds that would have otherwise been paid to BCC. *See id.* at 17, 231-32.

As a result of the foregoing, BCC filed this suit against Defendants for their alleged misrepresentations and for JetPay's alleged breach of the MSA's terms. In relief, BCC seeks over $2 million in damages, most significantly for its lost profits and business resulting from the departure of dissatisfied merchant customers. *See id.* at 14, 341-44. BCC also sues for recovery of the salaries it paid employees to work on matters that JetPay caused, and for the travel, IT Development, and related costs that BCC incurred during its remediation work. *Id.* at 18. Among other damages, BCC also seeks recovery of $100,000 in fees that JetPay procured from BCC through Merrick in January 2013. *See id.* at 17.

B.       *Preliminary Matters: Objections and Standing*

The Court turns now to JetPay's and Voigt's MSJ. Defendants raise two preliminary matters that the Court must quickly dispose of before reaching the parties' arguments on the merits. The first is a host of evidentiary objections that Defendants assert with respect to the documents and affidavits in BCC's appendix. The second involves contentions regarding BCC's "standing."

First, JetPay's and Voigt's Objections and Motion to Strike (doc. 222) asserts thirty different objections to twelve of BCC's exhibits primarily on relevance and foundational grounds. Rather than trudge through each of these, the Court simply notes for now that none of Defendants objections warrant outright exclusion of any of BCC's exhibits.[20] And to the extent any of the objected-to evidence in these exhibits is truly irrelevant to a particular issue, or contains conclusory opinions or

---

[20] Defendants' objections as to the form and foundation for some of BCC's exhibits are based on mere technicalities, such as the lack of signatures on certain documents and missing cover pages for deposition excerpts. Importantly, Defendants do not actually question the authenticity of these documents, which BCC shows it will be able to prove at trial. Thus, Defendants have not shown that these materials "cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(3). As to Exhibit A-2, which Defendants object to on timeliness grounds, the Court exercises its discretion to consider this exhibit, since BCC showed its late disclosure was "substantially justified" and "harmless." FED. R. CIV. P. 37(c)(1).

statements not based on the declarant's personal knowledge, the Court can take such deficiencies into consideration in its determination of whether BCC presented enough competent summary judgment evidence to create a genuine issue of material fact. For now, however, JetPay's and Voigt's Objections and Motion to Strike is hereby **OVERRULED** and **DENIED**.

Second, Defendants also bring up the preliminary issue of BCC's standing in their MSJ, arguing that BankCard, not BCC, suffered all the alleged damages claimed in this case. *See* JetPay's & Voigt's MSJ 20-21. Piggybacking off of Merrick's MSJ, JetPay and Voigt argue more directly in their Reply that BCC "has not established or even asserted Article III standing," because it has not "allege[d] a distinct and palpable injury to *itself*."[21] JetPay's & Voigt's MSJ 12-13. But as discussed above, BCC can claim injuries by way of its ownership interest in BankCard for purposes of Article III standing. *See Franchise Tax Bd. of Calif.*, 493 U.S. at 335-36. Moreover, unlike its claim against Merrick, BCC alleges injuries here based on a contract between itself and JetPay, not one that BCC's subsidiary entered into alone. Thus, BCC clearly has standing for its claims against JetPay and Voigt. In fact, the issue Defendants raise here—whether BCC can recover certain damages stemming from Defendants' alleged violations of BCC's contractual, common law, and statutory rights—ultimately goes to the merits of BCC's claims, and therefore, does not even implicate Article III standing. *See Cole v. Gen. Motors Corp.*, 484 F.3d 717, 723 (5th Cir. 2007) ("Whether recovery for [the plaintiffs'

---

[21] Confusingly, Defendants' standing assertions seem to concern prudential limitations—that BCC cannot assert claims based on injuries to a third party—but they also say that "[t]he question of prudential standing has not been raised in this case, nor does it make any sense." JetPay's & Voigt's MSJ 13. This confusion appears to be over Defendants' misunderstanding that the "zone of interest" test is not the only prudential standing limitation courts have recognized. *See id.* (arguing there is no prudential standing issue, because "[t]here is no statutory provision invoked in this suit which would raise the question of whether [BCC's claims] arguably fall within the zone protect by statute"). Regardless, to the extent Defendants mean to raise prudential standing as a defense, they have not asserted it in their pleadings or otherwise raised the issue during this suit, and as such, the Court finds the defense to be waived.

breach of contract] claim is permitted under governing law is a separate question; it is sufficient for standing purposes that the plaintiffs seek recovery for an economic harm that they allege they have suffered."). As such, the Court rejects Defendants' standing contentions.[22]

      C.     *Economic Loss Rule*

      Turning now to the substantive challenges in JetPay's and Voigt's MSJ, the Court first considers Defendants' contentions that summary judgment is appropriate with respect to BCC's tort and DTPA claims. These claims are based on allegations that "JetPay and Voigt negligently or intentionally made material and false (mis)representations to BCC . . . concerning JetPay's abilities, practices, processes, services, and systems." Third Am. Compl. ¶ 69; *see also id.* ¶¶ 74, 79, 85-86. BCC alleges that these misrepresentations on the part of Defendants were intended to, and did in fact, "induce BCC to enter into a contract with JetPay[,] to continue doing business with JetPay[,] . . . and to refrain from terminating the [MSA] with JetPay." *Id.* ¶¶ 74, 79.

      While Defendants present a number of bases on which they argue that summary judgment is appropriate for BCC's tort-based claims, the Court limits its below discussion to the dispositive grounds offered here, which are that BCC has failed to establish viable tort claims falling outside the scope of the economic loss rule. *See* JetPay's & Voigt's MSJ 11, 13-14. The Court previously discussed the economic loss rule in this case as it related to BCC's tort law claims against Merrick, and ultimately dismissed BCC's claims after finding that they were based "on the same factual allegations [asserted] in support of [BCC's] breach of contract claims [against Merrick]." July 28

---

[22] Nor does Defendants' suggestion that summary judgment is appropriate, because "BankCard Central, Inc. sued for these damages before." JetPay's & Voigt's MSJ 22. Even if true, Defendants offer no legal basis whatsoever for dismissing BCC's claims on this ground. The Court, therefore, need not discuss this irrelevant contention any further.

Order at 27. While instructive, this prior discussion admittedly involved a different body of law and a different set of allegations than those at issue here. Therefore, the Court must analyze anew BCC's allegations against JetPay and Voigt to determine whether, pursuant to Texas law, the economic loss rule bars BCC's fraud, negligent misrepresentation, and DTPA claims against Defendants.

Under Texas law, "where the damages claimed are . . . economic loss to the subject of the contract itself, the remedy ordinarily is one of contract alone." *Kevin M. Ehringer Enters., Inc. v. McData Servs. Corp.*, 646 F.3d 321, 325 (5th Cir. 2011) (citing *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998)). In determining whether this so-called "economic loss rule" precludes particular tort claims, Texas courts "look to the source of the duty allegedly violated and the nature of the claimed loss." *El Paso Mktg., L.P. v. Wolf Hollow I, L.P.*, 383 S.W.3d 138, 143 (Tex. 2012) (citing *Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494-95 (Tex. 1991)). In addition, the Texas Supreme Court has explained that the economic loss rule "is not generally applicable in every situation," and ultimately "allows recovery of economic damages in tort, or not, according to its underlying principles." *LAN/STV v. Martin K. Eby Const. Co.*, 435 S.W.3d 234, 235-36 (Tex. 2014). These principles, according to the Texas Supreme Court, include avoiding the indeterminate and disproportionate liability that economic damages tend to impose on tortfeasors, and giving deference to the parties contractual agreements, under which the "[r]isks of economic loss" have been bargained for and allocated between the parties themselves. *Id.* at 240-41.

1.  Fraud Claims

Having set forth the applicable law, the Court now considers the specific economic loss rule contentions made by the parties in this case, starting first with those relating to BCC's fraud claims. While BCC does not seem to dispute that its fraud damages are the same economic losses claimed

for its breach of contract action, it argues that its fraud claims, nonetheless, fall outside the scope of the economic loss rule, because they seek "damages suffered as a direct and proximate result of JetPay's misrepresentations made in the course of acquiring BCC's business." Pl.'s Resp. Opp'n JetPay's & Voigt's MSJ 37. Consequentially, BCC says that its fraud allegations amount to fraudulent inducement, to which the economic loss rule does not apply according to *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41 (Tex. 1998). While Defendants do not dispute that fraudulent inducement claims are not barred under Texas' economic loss doctrine, they counter that BCC has not established its fraud claims as such. JetPay's & Voigt's Reply 17-18. The Court, as follows, agrees with Defendants.

In *Formosa Plastics*, the Texas Supreme Court found that the economic loss rule does not apply to fraudulent inducement claims, because "the legal duty not to fraudulently procure a contract is separate and independent from the duties established by the contract itself." 960 S.W.2d at 46. The court, thus, concluded that "tort damages are recoverable for a fraudulent inducement claim irrespective of whether the fraudulent representations are later subsumed in a contract or whether the plaintiff only suffers an economic loss related to the subject matter of the contract." *Id.* at 47.

As the Texas Supreme Court later warned, however, "*Formosa Plastics* should not be construed to say that fraud and fraudulent inducement are interchangeable with respect to the measure of damages that would be recoverable." *Haase v. Glazner*, 62 S.W.3d 795, 799 (Tex. 2001). Under Texas law, a fraudulent inducement claim is "a particular species of fraud" claims, for which "the elements of fraud must be established as they relate to an agreement between the parties."[23] *Id.*

---

[23] The elements of a fraud claim generally include a representation: (1) that is material; (2) that is false; (3) that the speaker knew was false or recklessly did not know to be; (4) that the speaker intended the other to act upon in reliance; (5) that the other relied on; and (6) that caused the other to suffer an injury

at 798-99. Relatedly, "mere failure to perform contractual obligations as promised does not constitute fraud but is instead a breach of contract." *Kevin M. Ehringer Enters.*, 646 F.3d at 325 (citing *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986)). Accordingly, "[t]o be actionable as fraudulent inducement, a breach must be coupled with a showing that the promisor never intended to perform under the contract." *Id.* (citing *Spoljaric*, 708 S.W.2d at 434; *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 306 (Tex. 2006)).

Here, BCC's fraud claims are premised on assurances and nondisclosures that all relate to JetPay's promise to perform its *future* services in a "commercially reasonable" manner as later stipulated in the MSA. For instance, BCC alleges that it was "induced" to enter into the MSA based on JetPay's advertisements claiming to provide "first class customer support," and "expertise in advising and delivering optimal payment solutions tailored to the specific and unique needs of each customer." Third Am. Compl. ¶¶ 23, 24, 74. Likewise, BCC alleges that it was further induced by JetPay's and Voigt's assurances in pre-contractual discussions that JetPay was capable of handling BCC's specific needs, that JetPay could "duplicate" the reporting of CardWorks, that JetPay's system was "'state-of-the-art,'" and that JetPay had all the capabilities necessary to carry out the services BCC needed performed. *Id.* ¶¶ 26-27, 74, 79. Later, BCC says that JetPay additionally misrepresented that it would fix ongoing problems with its services in order to induce BCC to "refrai[n] from terminating its contract with JetPay" and grant JetPay "another opportunity to perform *as represented, promised and contracted.*" *Id.* ¶¶ 32, 33 (emphasis added). Despite BCC's attempt to paint the above representations as independent of JetPay's promises under the MSA, they all ultimately relate to

---

in its reliance. *ISG State Operations, Inc. v. Nat'l Heritage Ins. Co.*, 234 S.W.3d 711, 716 (Tex. App. 2007) (citing *Formosa Plastics*, 960 S.W.2d at 47.

JetPay's subsequently agreed-to obligations to perform in a "commercially reasonable" manner, which according to BCC, JetPay failed to fulfill by providing inadequate customer service, by handling the conversion process poorly, by employing sub-par processing and reporting software, and by generally failing to meet BCC's and its customer's needs. *See id.* ¶¶ 29, 30, 33, 34, 36, 37, 74, 79.

Accordingly, BCC cannot recover its economic losses under a fraud-based theory under these circumstances, unless it can show that Voigt and JetPay made the above promises regarding JetPay's commercially reasonable services "with no intention of performing the act." *Spoljaric*, 708 S.W.2d at 434 (citations omitted). This is what the plaintiff was able to show in *Formoso Plastics*, for example, where it was found that the defendant "made representations with no intention of performing as represented in order to induce [the plaintiff] to enter into [a] contract at a low bid price." 960 S.W.2d at 48.[24] But here, BCC has failed to present any allegations or evidence suggesting that Defendants had no intention of performing in a "commercially reasonable" manner. At worst, the evidence shows that Defendants over-estimated their abilities and failed to follow through on their contractual agreements, but "'[f]ailure to perform, standing alone, is no evidence of the promissor's intent not to perform when the promise was made.'" *Werth*, 294 S.W.3d at 911 (quoting *Spoljaric*, 708 S.W.2d at 435). Even drawing all inferences in BCC's favor, the Court cannot reasonably conclude that JetPay and Voigt agreed to perform in a commercially reasonable manner, while secretly harboring intentions not to do so. As such, BCC's fraud claims are subject to dismissal.

2.    Negligent Misrepresentation Claims

---

[24] *Compare with Hoffman v. AmericaHomeKey, Inc.*, 23 F. Supp. 3d 734, 743-44 (N.D. Tex. 2014) (dismissing fraudulent inducement claim based on representations concerning future events); *Werth v. Johnson*, 294 S.W.3d 908, 910-12 (Tex. App. 2009) (finding insufficient evidence to support fraudulent inducement claim based on promises as to future events); *Kevin M. Ehringer Enters.*, 646 F.3d at 325-28.

BCC's negligent misrepresentation claims against JetPay and Voigt are based on essentially the same allegations as its fraud claims, except that it alleges that Defendants negligently, instead of fraudulently, made the misrepresentations underlying these claims. Nonetheless, BCC presses a somewhat different theory as to why its negligent misrepresentations are not barred. Specifically, BCC argues that Texas draws a distinction between claims for "negligent performance of professional services," for which economic losses are barred, and "negligent misrepresentation claims," which BCC says are not necessarily barred "'depend[ing] on an analysis of [the economic loss rule's] rationales in a particular situation.'" Pl.'s Resp. Opp'n JetPay's & Voigt's MSJ 37-38 (citing *LAN/STV*, 435 S.W.3d at 246). And here, BCC contends that its "negligent misrepresentation claims are predicated upon JetPay's *initial* misrepresentations made prior to entering into a binding contract," not any allegations of JetPay's "negligent performance of professional services." *Id.* BCC, thus, concludes that "the Texas economic loss rule does not mandate barring BCC's negligent misrepresentation claim[s]." *Id.* at 38. The Court, as follows, disagrees with BCC's assessment.

While the Texas Supreme Court did acknowledge recently that it has allowed economic "losses in an action for negligent misrepresentation" in the past, *LAN/STV*, 435 S.W.3d at 244, none of the three cases it discussed in *LAN/STV* actually support the proposition, posited here by BCC, that Texas law categorically allows recovery of economic losses for negligent misrepresentation claims, so long as the misrepresentations precede a contract. Two of these cases mentioned in *LAN/STV* arose in a context completely different context than this case, where the negligent advise of professionals was relied upon by third parties not in privity with the professionals who made the

representations at issue.[25] In the third and final case discussed, *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439 (Tex. 1991), the Texas Supreme Court "held that prospective borrowers could recover the costs they incurred (but not lost profits) in relying on their lender's negligent misrepresentation to them that their loan application would be approved." *LAN/STV*, 435 S.W.3d at 244-45 (summarizing *Sloane*). But unlike here, the misrepresentations in *Sloane* did not involve promises as to future events that were later memorialized in a contractual agreement; in fact, the economic recovery allowed in *Sloane* was for costs incurred in anticipation of a *contract that was never formed*. *See Sloane*, 825 S.W.2d at 443 (disallowing recovery of loss profits, because the borrowers "would not have received the contract regardless of whether the misrepresentation was made").

This case is much more like *D.S.A., Inc. v. Hillsboro Indep. Sch. Dist.*, 973 S.W.2d 662 (Tex. 1998). Similar to here, the plaintiff in *D.S.A.* brought breach of contract and negligent misrepresentation claims in connection with the defendant's alleged failure to perform its "supervisory duties under the contract." *Id.* at 663. Like in this case, the plaintiff's negligent misrepresentation claim in *D.S.A.* was based on misrepresentations made "during pre-contractual negotiations." *Id.* On appeal, the defendant argued that the claim "sound[ed] only in contract," to which the plaintiff responded by citing *Formosa Plastic* for the proposition that "it could recover in tort for losses related to the subject matter of the contract because [the defendant] had a legal duty, independent from its contractual duties, not to make misrepresentations to induce [the plaintiff] into the contract." *Id.* The Texas Supreme Court rejected this comparison, holding that *Formosa Plastic*'s

---

[25] *See McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787 (Tex. 1999) (allowing recovery of economic damages for lawyers' negligent advice despite absence of privity with third party who may have justifiably relied on advice); *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913 (Tex. 2010) (holding that accountant may be liable for negligent misrepresentations in corporate audit report relied on by investors).

"rejection of the independent injury requirement in fraudulent inducement claims does not extend to claims for negligent misrepresentation or negligent inducement." *Id.* The court, therefore, concluded that the plaintiff's negligent misrepresentation claim failed "for lack of any independent injury," since contractual "benefit of the bargain" damages are "not available for a claim of negligent misrepresentation," and the plaintiff made no effort to claim damages outside of these. *Id.* at 663-64; *see also Clark v. PFPP Ltd. P'ship*, 455 S.W.3d 283, 289 (Tex. App. 2015) (finding that the plaintiff's negligent misrepresentation claim is barred where its "factual basis . . . was that, based on misrepresentations made by [an agent of the defendant], she agreed to buy the truck and that, by selling her a stolen truck, [the agent] failed to abide by the terms of the contract between them"); *Sterling Chemicals, Inc. v. Texaco Inc.*, 259 S.W.3d 793, 798 (Tex. App. 2007) (no independent injury alleged for negligent misrepresentation claim involving misrepresentations that allegedly induced the plaintiff to enter into an agreement that was breached, causing losses from disruption in business).

As in *D.S.A.*, BCC essentially alleges a "negligent inducement" claim, which is not a recognized cause of action in Texas. In these circumstances, BCC must allege or show that it suffered legal injuries independent from those claimed with respect to its breach of contract claim. Its best effort to do this is a single conclusory assertion in its brief that "BCC seeks recovery of its lost profits *and out-of-pocket damages* incurred in reliance on JetPay's misrepresentations." Pl.'s Resp. Opp'n JetPay's & Voigt's MSJ 38 (emphasis in original). But it points the Court to no evidence or allegations of these supposed out-of-pocket damages sought, and otherwise makes no effort to distinguish between its contractual and tort-based damages. Moreover, the policies underlying the economic loss rule in Texas further support its application in this case, where it makes sense to defer to the parties bargained-for agreement as to the allocation of economic losses they might incur over

the course of their business relationship. *See LAN/STV*, 435 S.W.3d at 248 (finding that the economic loss rule applicable in a context in which "[i]t makes sense to let the parties bargain about [who should bear the risk of loss] rather than impose a 'legal solution'") (citation omitted). For these reasons, the Court finds that BCC's negligent misrepresentations claims fail as a matter of law.

### 3.   DTPA Claim

BCC's contentions with respect to its DTPA claim are much like its contentions above. In short, it argues here that the economic loss rule does not apply to its DTPA claim, because the claim concerns Defendants' statutory duties that "arose independently from those contemplated by the parties' contractual arrangement." Pl.'s Resp. Opp'n JetPay's & Voigt's MSJ 39-40. The Court, for reasons similar to those discussed above, again finds BCC's contentions unavailing.

The Texas Supreme Court has extended the principles underlying the economic loss rule to DTPA claims under the "mere breach of contract" defense. *See Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 14 (Tex. 1996). This defense generally holds that "'[a]n allegation of a mere breach of contract, without more, does not constitute a false, misleading or deceptive act in violation of the DTPA.'" *Id.* (quoting *Ashford Dev., Inc. v. USLife Real Estate Servs.*, 661 S.W.2d 933, 935 (Tex. 1983)). Like the economic loss doctrine, the mere breach of contract defense "is based upon the general proposition that, when the injury is only the economic loss to the subject of the contract itself, the action sounds in contract alone." *SCS Builders, Inc. v. Searcy*, 390 S.W.3d 534, 540 (Tex. App. 2012) (citation omitted).

Applying this defense in a similar context, the Texas Supreme Court in *Crawford* rejected a plaintiff's contentions that defendants' "misrepresentations during the meetings at which [the plaintiff] agreed to renew . . . [its] contract . . . [amounted to] more than mere nonperformance

under the contract," and instead, constituted an "actionable [claim] under the DTPA laundry list provision." 717 S.W.2d at 14. The court said that accepting such contentions "would convert every breach of contract into a DTPA claim." *Id.* Moreover, the court explained that the allegedly false statements underlying the DTPA claim "were nothing more than representations that the defendants would fulfill their contractual duty." *Id.* "The *statements* themselves did not cause any harm," the court reasoned, it was the defendants' alleged failure to perform their contractual obligations that "actually caused" the economic losses at issue. *Id.* (emphasis in original). Such losses, the court concluded, are "governed by contract law, not the DTPA." *Id.* at 14-15; *see also Robinson v. Match.com, L.L.C.,* No. 3:10-CV-2651-L, 2012 WL 3263992, at *15-*16 (N.D. Tex. Aug. 10, 2012) (dismissing DTPA claim in which the defendant allegedly "made certain misrepresentations regarding its dating services to get Plaintiffs to subscribe or renew their subscriptions," since the claim, at its "essence," was "virtually identical" to Plaintiffs' breach of contract claim).

In this case, BCC's DTPA allegations and contentions in opposition to the economic loss rule's application are substantively identical to those rejected in *Crawford*. Similar to the claim in *Crawford*, BCC's claim pursuant to the DTPA is based on allegations that Defendants made a number of misrepresentations regarding JetPay's services in order to induce BCC to enter into and maintain the MSA. BCC argues, just as the plaintiff in *Crawford* did, that these misrepresentations violated Defendants' "separate, distinct, and independent duty not to misrepresent JetPay's capabilities, and capacity to perform," making this claim much more than a mere breach of contract. Pl.'s Resp. Opp'n JetPay's & Voigt's MSJ 39-40. As discussed in *Crawford*, however, such assertions are insufficient to avoid the mere breach of contract rule under Texas law.

Applying the mere breach of contract rule and its principles here, the Court finds no dispute

over the fact that the economic losses claimed by BCC for its DTPA action are the same losses claimed for its breach of contract action. Nor does BCC show that these losses actually stem from Defendants' misrepresentations themselves. Instead, these losses were caused by Defendants' alleged breach of contract; the misrepresentations merely caused BCC to enter into the contract that Defendants later breached. Under Texas law, such economic losses are "governed by contract law, not the DTPA." *Crawford*, 717 S.W.2d at 14-15. Accordingly, BCC's DTPA claim is a mere breach of contract action that the Court cannot sustain.

To summarize, the Court finds that the economic loss rule bars BCC's four tort-based claims, which all seek recovery of purely economic losses to the subject of the MSA and ultimately rely on the same alleged misconduct supporting BCC's breach of contract claim. And to the extent BCC purports to base its claims on legal duties independent of Defendants' duties under the MSA, the Court determines that BCC has not adequately established its claims pursuant to such legal theories. The Court, therefore, concludes that summary judgment is appropriate as to BCC's common law fraud, fraud by nondisclosure, negligent misrepresentation, and DTPA claims against Defendants.

D.      *Breach of Contract*

The above analysis leaves BCC with only its breach of contract claim against JetPay. Under Texas law,[26] BCC must establish the following essential elements for its breach of contract claim: "'(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the

---

[26] While neither party explicitly says what body of law should apply here, the record makes clear that Texas law is controlling. In a diversity case such as this, the Court applies the choice of law rules of Texas, under which "contractual choice of law provisions are typically enforced." *Smith v. EMC Corp.*, 393 F.3d 590, 597 (5th Cir. 2004). And here, the MSA provides that "the laws of the State of Texas" shall control, which the Court finds no reason not to enforce. Master Service Agreement § 8.5.

breach.'" *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (quoting *Valero Mktg. & Supply Co. v. Kalama Int'l, L.L.C.*, 51 S.W.3d 345, 351 (Tex. App. 2001)). Here, JetPay challenges the third and fourth elements of BCC's claim, each of which the Court addresses below.

### 1.    JetPay's Breach

The Court first considers JetPay's contentions as to the third element of BCC's breach of contract claim, which JetPay attacks on three separate grounds. *See* JetPay's & Voigt's MSJ 15-17. First, JetPay argues that BCC has not established that JetPay "can be held *contractually* liable for the conduct [BCC] alleges," because BCC "still has not and cannot point to any contract provision which Defendants breached." *Id.* at 17 (emphasis in original). Second, JetPay also says that there was no breach, because BCC "did not satisfy conditions precedent to the contract," which according to JetPay, included payment of "the appropriate fees under the Agreement." *Id.* 15. Third, JetPay lastly claims that "the wrongful conduct alleged by [BCC] is not part of the Agreement," and instead, "all relate[s] back to tort claims for negligent misrepresentation and fraud." *Id.* at 16. The Court, as follows, finds no support for any of these three assertions.

First, the Court finds unpersuasive JetPay's contentions that BCC cannot establish that JetPay breached any provision of the MSA. In support of this contention, JetPay's sole argument is that BCC "still has not and cannot point to any contract provision which [JetPay] breached." JetPay's & Voigt's MSJ 17. On the contrary, BCC supports its breach of contract claim by highlighting provisions of the MSA obligating JetPay to "perfor[m] the services contemplated by this Agreement . . . [with] commercially reasonable care and diligence." Master Service Agreement § 6.3; *see also id.* § 2 (discussing the services JetPay was obligated to provide). Additionally, BCC shows that JetPay failed to carry out these contractual obligations in a number of ways. *See* Pl.'s Resp. Opp'n

JetPay's & Voigt's MSJ 31-33. For example, BCC submits affidavits and emails evidencing JetPay's failure to carry out its data capture, processing, and communication services in a commercially reasonable manner. *See id.* at 31-32. BCC similarly shows that JetPay lacked commercially reasonable quality assurance and customer support services as JetPay agreed to provide in the MSA. *See id.* at 33. As BCC correctly surmises, this evidence is enough to establish "the existence of genuine issues of material fact concerning JetPay's breach of the MSA." *Id.*

Second, the Court also finds no support for JetPay's contentions that a condition precedent excuses its alleged breach. Texas law holds that "[a] condition precedent is an act or event that must take place before performance of a contractual obligation is due." *Cedyco Corp. v. PetroQuest Energy, LLC*, 497 F.3d 485, 488 (5th Cir. 2007) (citing *Hohenberg Brothers Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex.1976)). In determining whether a condition precedent exists, Texas courts look to the contract for evidence that the parties intended to include such a condition. *Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990). "While no particular words are necessary for the existence of a condition, such terms as 'if', 'provided that', 'on condition that', or some other phrase that conditions performance, usually connote an intent for a condition rather than a promise." *Hohenberg Bros.*, 537 S.W.2d at 3. As a matter of policy, condition precedents are disfavored in Texas. *See Criswell*, 792 S.W.2d at 948 (citing *Sirtex Oil Industries, Inc. v. Erigan*, 403 S.W.2d 784, 787 (Tex. 1966); *Hohenberg Bros.*, 537 S.W.2d at 3). Thus, courts applying Texas law are instructed to avoid "finding a condition precedent . . . if another reasonable reading of the contract is possible." *FaulknerUSA, LP v. Alaron Supply Co.*, 322 S.W.3d 357, 359 (Tex. App. 2010) (citing *Criswell*, 792 S.W.2d at 948; *Schwarz–Jordan, Inc. of Houston v. Delisle Const. Co.*, 569 S.W.2d 878, 881 (Tex. 1978)).

Here, JetPay does not point the Court to any language of the MSA purporting to manifest the parties' intentions to include a condition precedent to JetPay's performance. Rather, it merely highlights evidence suggesting that BCC failed to pay some of JetPay's invoiced fees, and then argues that this shows that a condition precedent was violated, presumably based on the unfounded assumption that BCC's full payment was a condition precedent to performance. *See* JetPay's & Voigt's MSJ 15. This is not sufficient to carry JetPay's summary judgment burden, given Texas' policy disfavoring condition precedents. Moreover, examining the provisions that set forth JetPay's obligations to perform under the MSA reveals no language conditioning JetPay's performance on BCC's payment. *See* Master Service Agreement § 2 (discussing the services that "will be provided by JETPAY" or that "JETPAY will provide"), § 6.3 (providing that "JETPAY shall exercise commercially reasonable care and diligence subject to the limitations contained in this paragraph," none of which concern BCC's obligation to pay). Nor do the provisions establishing JetPay's payment obligations suggest any intention to condition JetPay's services on BCC's payment. *See id.* § 4, ¶ 4.2 (stating merely that BCC "shall pay to JETPAY the fees and other charges" in accordance with the schedules to the MSA). The MSA does allow JetPay to terminate its *future* performance by following the procedures set forth in Section 5, but even assuming JetPay followed such procedures—which it provides no evidence of—these provisions in no way condition JetPay's *past* failures to adequately perform its contractual duties on BCC's payment of fees. *See id.* § 5. Constructing these provisions in accordance with Texas law, the Court can reasonably discern BCC's and JetPay's intent to set forth unconditional promises to perform their mutual contractual obligations, with supplemental procedures for excusing future, but not past, obligations in the event of a breach. Consequentially, JetPay cannot avoid its alleged breach on the basis of its unsupported condition precedent defense.

Third, the Court additionally rejects JetPay's arguments that summary judgment is appropriate because BCC's breach of contract allegations "relate back to tort claims for negligent misrepresentation and fraud." JetPay's & Voigt's MSJ 16. These arguments appear to be an ill-fated attempt by JetPay to apply the economic loss rule in reverse, such that BCC's breach of contract claim is barred based on its relation to BCC's tort claims. Defendants, unsurprisingly, offer no authority to support such a proposition. Therefore, the Court need not consider this baseless defense any further. And having found, above, that BCC presented enough evidence to create a genuine issue of fact as to JetPay's breach of the MSA, the Court concludes that Defendants are not entitled to summary judgment on this basis.

### 2.   BCC's Damages

Next, the Court considers JetPay's final challenge to BCC's claims, pursuant to which JetPay argues that BCC cannot establish that it suffered any damages as a result of the alleged breach. *See* JetPay's & Voigt's MSJ 19-38. JetPay offers two grounds for dismissing in full or in part BCC's breach of contract claim for failure to establish damages. First, JetPay contends that there is no genuine dispute regarding BCC's inability to show that it actually suffered any of its alleged damages as a proximate result of JetPay's breach. *See id.* at 23-38. Second, JetPay alternatively asserts that BCC's damages are barred by Section 6.4 of the MSA, under which JetPay says the parties agreed that neither party would be liable to the other for consequential damages.[27] *See id.* 19-20. In response,

---

[27] JetPay additionally points to Section 6.1 of the MSA as part of its general position that BCC's damages are contractually barred. *See* JetPay's & Voigt's MSJ 20. But as seen below, Section 6.1 merely limits the overall damages BCC may collect from JetPay, which JetPay does not dispute. *See id.* (arguing, based on Section 6.1, that "even in the event Plaintiff would be entitled to a recovery, Plaintiff would still be limited to the lesser of the two amounts"). Thus, since it is undisputed that Section 6.1 does not prevent BCC from collecting at least some of its damages, the Court need not discuss this as a basis for summary judgment.

BCC denies both of these contentions, *see* Pl.'s Resp. Opp'n JetPay's & Voigt's MSJ 15-18, 19-29, each of which the Court addresses below.

First, in regards to the evidence supporting the fourth element of BCC's breach of contract claim, the Court finds there to be a genuine dispute as to the "'damages sustained by [BCC] as a result of [JetPay's] breach.'" *Smith Int'l*, 490 F.3d at 387 (quoting *Valero Mktg. & Supply*, 51 S.W.3d at 351) (referencing the fourth breach of contract element). In Texas, the general "'rule for measuring damages for the breach of a contract is just compensation for the loss or damage actually sustained.'" *Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991) (quoting *Stewart v. Basey*, 245 S.W.2d 484, 486 (Tex. 1952)). To recover such actual damages in a breach of contract action, the plaintiff must establish that its damages are "the natural, probable, and foreseeable consequence of the defendant's conduct." *Mead v. Johnson Grp., Inc.*, 615 S.W.2d 685, 687 (Tex. 1981).

Here, BCC has proffered adequate proof to reasonably establish that it suffered actual damages, and that those damages are sufficiently traceable to JetPay's failure to perform its contractual services in a "commercially reasonable" manner. Without going into the minutiae of the parties' dispute here, it suffices to say that a jury could reasonably infer from the MSA, the context in which the parties carried out the MSA, JetPay's asserted failure to perform as promised, the problems JetPay's failures purportedly caused BCC, Merrick, and BCC's merchant customers, and the monetary losses claimed by BCC as supported by affidavits and records, that BCC's damages are the natural, probable, and foreseeable consequence of JetPay's breach. And ultimately, JetPay's arguments to the contrary really just go to the weight of the evidence as well as factual issues

concerning the precision of BCC's damages estimates.[28] Such matters are not for the Court to resolve

at this stage. *See Anderson*, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function

is not himself to weigh the evidence and determine the truth of the matter but to determine whether

there is a genuine issue for trial."). Therefore, the Court concludes that BCC has created a genuine

dispute regarding the damages it allegedly sustained as a result of JetPay's breach.

 Second, JetPay additionally challenges BCC's damages on the ground that they are barred

by Section 6.4 of the MSA. In relevant part, Section 6.4 states that "IN NO EVENT SHALL

EITHER PARTY BE RESPONSIBLE TO THE OTHER FOR SPECIAL, INCIDENTAL,

CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES ARISING FROM OR AS A

RESULT OF ANY BREACH OF THIS AGREEMENT." Master Service Agreement § 6.4. JetPay

contends that this language plainly bars BCC from recovering the damages it seeks in this case, which

according to JetPay, "are wholly special, incidental, and consequential in nature." JetPay's & Voigt's

MSJ 18-20. BCC counters by arguing, first, that its damages are "direct," not consequential, and

second, that even if its damages are consequential, Section 6.4 does not undisputedly bar any such

consequential damages as a matter of law, because this provision is "ambiguous." Pl.'s Resp. Opp'n

JetPay's & Voigt's MSJ 15-18, 19-29. The Court takes up each of these issues below.

   *i.*   *Are BCC's damages direct or consequential?*

 In determining whether Section 6.4 of the MSA bars any or all of BCC's damages, the Court

starts with the issue of whether BCC's damages qualify as "direct" or "consequential" under Texas

---

 [28] Additionally, the bulk of JetPay's contentions in this regard concern BCC's lost profit damages, which is a moot point in light of the Court's below discussion regarding Section 6.4 of the MSA.

law.[29] To the extent any of BCC's damages are direct, JetPay's contention regarding Section 6.4's preclusion of consequential damages will be moot.

As mentioned above, the typical measure of damages recoverable in a breach of contract action are referred to as "actual damages." *Mead*, 615 S.W.2d at 687. Under Texas common law,[30] "actual damages are either 'direct' or 'consequential.'" *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997) (citations omitted). Damages are "direct" if they "'are the necessary and usual result of the defendant's [breach],'" such that "they flow naturally and necessarily from the wrong.'" *El Paso Mktg.*, 383 S.W.3d at 144 (quoting *Arthur Anderson*, 945 S.W.2d at 816). By contrast, "[c]onsequential damages' . . . are those said to result naturally but not necessarily from the wrongful act because they require the existence of some other fact beyond the relationship of the parties." *DaimlerChrysler Motors Co., LLC v. Manuel*, 362 S.W.3d 160, 180 (Tex. App. 2012) (citing *Arthur Anderson*, 945 S.W.2d at 816).

In this case, JetPay broadly asserts that all of BCC's damages are "wholly . . . consequential in nature," JetPay's & Voigt's MSJ 18-20, which BCC denies both generally, by pointing to evidence of direct losses caused by JetPay's inadequate services, and specifically, by pointing to particular

---

[29] Though Section 6.4 purports to exclude consequential, incidental, and special damages, the parties focus exclusively on the distinction between "direct" and "consequential" damages, which the Court does as well in its discussion that follows. In any event, "consequential" and "special" damages appear to be interchangeable under Texas law. *See Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007) (defining "'[s]pecial damages'" and "consequential damages" the same). And while "incidental damages" are clearly a separate category of damages in contracts for the sale of goods, they are not necessarily separate under the Texas common law. Regardless, incidental damages "are often readily identifiable as an item of contract damages," *Reynolds Metals Co. v. Westinghouse Elec. Corp.*, 758 F.2d 1073, 1079 (5th Cir. 1985), and the damages highlighted by the parties in this case do not readily appear to be incidental.

[30] There appears to be no dispute that the MSA is a services contract, and not a contract for the sale of goods. Thus, Texas common law, rather than the Texas Uniform Commercial Code ("UCC"), applies. *See* TEX. BUS. & COM. CODE § 2.102 (providing that the Texas UCC "applies to transactions in goods").

categories of losses that BCC argues are direct. *See* Pl.'s Resp. Opp'n JetPay's & Voigt's MSJ 19-29. Based on this showing, the Court concludes that a jury could reasonably find that BCC suffered at least some "direct" losses as a result of JetPay's breach. For example, BCC highlights the $100,000 in disputed processing fees that JetPay procured from BCC through Merrick in January 2013 as part of the direct losses BCC suffered. *See id.* at 25. On top of failing to show how these particular damages are not direct, JetPay essentially concedes in its opening brief that damages of this nature would qualify as direct in this case. *See* JetPay's & Voigt's MSJ 18 (explaining that for BCC's damages to be "direct," BCC must seek "damages that would necessarily result from an alleged breach of the agreement, *such as the amount of Processing Fees paid*") (emphasis added). Also, BCC presents evidence showing, more generally, that it suffered damages as a direct result of JetPay's failure to perform in a "commercially reasonable" manner. Even if the precise amount of these damages have not yet been determined, this is enough at this stage to show that genuine factual disputes remain as to how much a jury should reasonably award for the direct losses caused by JetPay's breach. In short, BCC has established, for purposes of summary judgment, that at least some of the damages it seeks for its breach of contract claim against JetPay are direct, and thus, not barred by Section 6.4 of the MSA.

Nonetheless, there are certain damages sought by BCC that do qualify as consequential. For starters, BCC concedes that its "consequential damages in this case include costs for IT Development, lost staff salaries, replacement equipment, and travel during the period in which BCC attempted to collaborate and resolve the multiple credit card processing issues resulting from JetPay's faulty data processing." Pl.'s Resp. Opp'n JetPay's & Voigt's MSJ 27. In addition, the parties hotly contest whether BCC's lost profits stemming from the departure of dissatisfied merchants are

consequential in nature. JetPay argues that these lost profit damages are "consequential in nature," since they do not "necessarily result from an alleged breach of the agreement," but instead, are based on allegations that JetPay's "conduct triggered a chain of events culminating in the loss of [BCC's] business and resulting damages." JetPay's & Voigt's MSJ 18. BCC counters that its lost profits are direct, because they were "BCC's primary benefit of the bargain with JetPay." *Id.* at 21. According to BCC, its chief expectation in entering into the MSA was "to earn profits from its customers based upon JetPay's performance as a third party processor in a commercially reasonable manner," which the MSA reflects through its various references to "BCC's merchant accounts/agreements." *Id.* And since JetPay has "offered no controverting evidence that BCC's direct benefit of the bargain was otherwise," BCC maintains that the Court must conclude that these damages are direct. *Id.* The Court, however, finds JetPay's position to be more consistent with Texas law.

Under Texas law, "lost profits damages may take the form of 'direct' damages or the form of 'consequential' damages," depending on the context in which they arise. *Cont'l Holdings, Ltd. v. Leahy*, 132 S.W.3d 471, 475 (Tex. App. 2003). For example, "profits lost on the contract itself—such as the amount a party would have received on the contract minus its saved expenses—are direct damages." *Cherokee Cnty. Cogeneration Partners, L.P. v. Dynegy Mktg. & Trade*, 305 S.W.3d 309, 314 (Tex. App. 2009); *see also Mood v. Kronos Products, Inc.*, 245 S.W.3d 8, 12 (Tex. App. 2007); *Leahy*, 132 S.W.3d at 475. On the other hand, "profits lost on other contracts or relationships resulting from the breach (such as resale of property to a third party) are generally classified as indirect or consequential damages." *DaimlerChrysler Motors*, 362 S.W.3d at 181; *see also Tennessee Gas Pipeline Co. v. Technip USA Corp.*, No. 01-06-00535-CV, 2008 WL 3876141, at *11 (Tex. App. Aug. 21, 2008).

- 54 -

Here, BCC's lost profits do not constitute direct losses on the MSA itself, but instead, are consequential losses "on other contracts or relationships resulting from the breach." *Mood*, 245 S.W.3d at 8 (citing *Leahy*, 132 S.W.3d at 475). Despite BCC's protestations, it does not matter whether BCC's profits on merchant accounts were its "primary benefit of the bargain expectations," unless such expectations were actually reflected in the MSA such that any loss of these profits would "flow naturally and necessarily from" JetPay's breach. *Arthur Anderson*, 945 S.W.2d at 816. In *Cherokee Cnty.*, for example, the Texas Court of Appeals found that a natural gas purchaser's lost profits constituted "direct damages," because the purchaser's expectations "to recover the market value of the gas not delivered less the contract purchase price" were explicitly provided for in the parties' agreement. 305 S.W.3d at 315. But here, the MSA merely refers sporadically to BCC's merchant accounts, without providing any sort of measure of damages that BCC may collect in the event JetPay's unreasonably-performed services cause BCC to lose profits on these third party agreements. And while the MSA's references to BCC's merchant accounts may have rendered the lost profits foreseeable, nothing in the MSA actually demonstrates that the lost profits were a necessary by-product of JetPay's breach. Instead, BCC's lost profits flowed necessarily from BCC's third-party agreements, and were only an indirect consequence of JetPay's failure to perform in a commercially reasonable manner. Accordingly, the Court agrees with JetPay that the lost profits claimed by BCC qualify as "consequential damages" under Texas law.

In sum, BCC has adequately demonstrated that at least some of its losses are direct, and thus, that it may move forward on its breach of contract claim against JetPay with respect to these damages. However, other losses claimed by BCC are consequential in nature, including the costs it incurred while remedying JetPay's inadequate services and BCC's lost profits. For these, the Court

must next consider whether Section 6.4 of the MSA actually bars BCC's consequential damages.

ii.     *Does the MSA unambiguously bar BCC's consequential damages?*

As mentioned, JetPay argues that the plain language of Section 6.4 of the MSA leaves no doubt that BCC is precluded from recovering consequential damages in this case. JetPay's & Voigt's MSJ 19. Moreover, since the MSA is a commercial agreement between two equally sophisticated parties, JetPay says that Section 6.4's clear exclusion of consequential damages is valid and enforceable under Texas law. *Id.* at 19-20. In response, BCC does not dispute that an agreement of this nature is valid and enforceable under Texas law. *See generally Tennessee Gas Pipeline*, 2008 WL 3876141, at *6 (citing *GT & MC, Inc. v. Tex. City Refining, Inc.*, 822 S.W.2d 252, 256 (Tex. App. 1991)) ("[P]arties to a contract are free to limit or modify the remedies available in the event of a breach of the contract."). Instead, it contends that Section 6.4 of the MSA does not bar BCC's consequential damages as a matter of law, because the provision is "ambiguous," thus creating an "open question of fact" for trial. Pl.'s Resp. Opp'n JetPay's & Voigt's MSJ 16.

"Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered into." *Instone Travel Tech Marine & Offshore v. Int'l Shipping Partners, Inc.*, 334 F.3d 423, 431 (5th Cir. 2003) (citing *In re El Paso Refinery, LP*, 302 F.3d, 343, 353 (5th Cir. 2002); *Friendswood Development Co. v. McDade & Co.*, 926 S.W.2d 280, 282 (Tex. 1996)). Contractual language "susceptible to only one reasonable construction . . . is unambiguous and will be enforced as written." *Id.* (citing *Guaranty Nat. Ins. Co. v. Azrock Indus. Inc.*, 211 F.3d 239, 243 (5th Cir. 2000)). Conversely, "if the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, which creates a fact issue on the parties' intent." *Columbia Gas*

*Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996) (citing *Universal C.I.T.*

*Credit Corp. v. Daniel*, 243 S.W.2d 154, 157 (Tex. 1951); *Nat'l Union Fire Ins. Co. of Pittsburgh v. CBI*

*Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995)).

      In support of its argument that Section 6.4 is ambiguous, BCC primarily relies on Section 6.1

of the MSA. In relevant part, Section 6.1 states that:

> JETPAY's cumulative liability for any loss or damage, direct or indirect, for any cause
> whatsoever (including, but not limited to those arising out of or related to this
> Agreement) with respect to claims relating to events in any one 12-month period
> following the effective date of this Agreement shall, under any circumstances, be the
> lesser of:
>     a. The amount of [BCC's] losses, damage, and liability including, but not
> limited to all costs and expenses incurred by [BCC], including attorney's fees and all
> cost of litigation or
>     b. The amount of Processing Fees paid to JETPAY pursuant to this
> Agreement for services performed in the immediately preceding 12-month period,
> and in the case of the first 12-month period of the Agreement, any minimum
> processing fees specified for year one in Schedule A.

Master Service Agreement § 6.1. BCC contends that this language renders Section 6.4 ambiguous,

because in contrast to Section 6.4's exclusion of consequential damages, Section 6.1 "permits BCC

to recover direct *and indirect* damages." Pl.'s Resp. Opp'n JetPay's & Voigt's MSJ 16 (emphasis

added). This permissive language, BCC maintains, creates an ambiguity as to whether the parties

intended to actually exclude recovery of all consequential damages, including, most notably, BCC's

lost profits. *See id.* at 16, 21. As further support, BCC points to "multiple provisions in the MSA"

purportedly showing that the parties intended "to protect the profits BCC derived from its merchant

portfolio" from a breach by JetPay. *Id.* at 21 (citing Mast Service Agreement §§ 2.1, 2.2, 2.3, 4.1, 5.4,

8.12). The Court, however, finds these contentions unpersuasive.

      It is true, as BCC suggests, that a cardinal rule of contract interpretation under Texas law is

that "the entire writing" must be examined, and that "[n]o single provision taken alone [may] be given controlling effect." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). The reason, however, that Texas courts "consider the entire writing [is] to harmonize and effectuate all provisions such that none are rendered meaningless." *FPL Energy, LLC v. TXU Portfolio Mgmt. Co., L.P.*, 426 S.W.3d 59, 63 (Tex. 2014) (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)). Moreover, an ambiguity is not created "simply because the parties advance conflicting interpretations of the contract." *Columbia Gas Transmission*, 940 S.W.2d at 589 (citing *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994); *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 727 (Tex. 1981)). Rather, an ambiguity exists only where such conflicting interpretations are "*reasonable.*" *Id.* (citing *CBI*, 907 S.W.2d at 520; *Glover v. Nat'l Ins. Underwriters*, 545 S.W.2d 755, 761 (Tex. 1977)) (emphasis in original).

Applying these principles to this case, the Court finds no ambiguity in the prohibition on consequential damages contained in Section 6.4 of the MSA. To start, JetPay reasonably proposes that the Court simply interpret Section 6.4 in accordance with its plain language, which states in unequivocal terms that "IN NO EVENT SHALL EITHER PARTY BE RESPONSIBLE TO THE OTHER FOR . . . CONSEQUENTIAL . . . DAMAGES ARISING FROM OR AS A RESULT OF ANY BREACH OF THIS AGREEMENT." Moreover, despite BCC's contentions otherwise, this plain-language interpretation can be reasonably harmonized with Section 6.1, which simply acts as a further limit on JetPay's "cumulative liability." While Section 6.1 does allude to an expansive definition of potential losses that BCC could hold JetPay liable for ("any loss or damage, direct or indirect"), this mere reference to JetPay's indeterminate liability "for any cause whatsoever (including, but not limited to those arising out of or related to [the MSA]," does not conflict with

Section 6.4's specific exclusion of consequential damages "ARISING FROM OR AS A RESULT OF ANY BREACH OF [the MSA]." Reasonably construed, Section 6.1 merely includes this reference to the expansive liability JetPay could incur in order to make clear that, regardless of how vast BCC's "losses" may be, JetPay's "cumulative liability . . . shall, under any circumstances, be the lesser of" (a) such potentially-vast losses or (b) the total amount of fees collected by JetPay over the same period.

In contrast to this reasonably construction of the MSA, BCC's proposed reading of Sections 6.4 and 6.1 is inconsistent with Texas' rules of contract interpretation. According to BCC, Section 6.1 should be read as permitting recovery of BCC's "indirect" losses arising from JetPay's breach simply because the provision includes the words "any loss or damage, direct or indirect." But this reading does not reasonably account for the surrounding language in Section 6.1 that demonstrates the provision's clear intent to *limit* JetPay's "cumulative liability" ("shall, under any circumstances, be the lesser of"), not *create* new damages that BCC does not otherwise have "for any cause whatsoever." Moreover, BCC's proffered interpretation would render Section 6.4 meaningless, as it would permit BCC to hold JetPay responsible for consequential damages in a breach of contract action, despite Section 6.4's unequivocal exclusion of such damages. An interpretation of this nature, which would render a contractual provision meaningless, is not reasonable under Texas law. *See Coker*, 650 S.W.2d at 394 ("Courts must favor an interpretation that affords some consequence to each part of the instrument so that none of the provisions will be rendered meaningless."); *Innovate Tech. Solutions, L.P. v. Youngsoft, Inc.*, 418 S.W.3d 148, 152 (Tex. App. 2013) (rejecting proposed "interpretation [that] would render [other] provisions of the Agreement surplusage, preventing the court from giving effect to all provisions of the contract"); *DaimlerChrysler Motors*, 362 S.W.3d at 185 ("It is not reasonable to interpret both terms [in a way] . . . that would render one or the other

term meaningless or redundant."). And since it failed to put forth a conflicting interpretation of Section 6.4 that is "reasonable," the Court rejects BCC's contentions that the provision's exclusion of consequential damages is ambiguous. *See Columbia Gas Transmission*, 940 S.W.2d at 589.

Finally, the Court also rejects BCC's suggestions that references in the MSA to BCC's merchant accounts somehow reflect the parties' intentions to allow BCC to recover lost profits on such accounts, in spite of Section 6.4's clear prohibition of consequential damages like these losses. For instance, BCC highlights Section 8.12 of the MSA, which prohibits JetPay from, among other things, "induc[ing] or attempt[ing] to induce" BCC's merchants "to modify, disrupt, or terminate [their] merchant business association[s], whether contractual or otherwise, with [BCC]." Master Service Agreement § 8.12. But while this provision may provide BCC a "direct" action for lost profits stemming from JetPay's attempts to steal BCC's merchant customers in violation of Section 8.12, it does not render BCC's lost profit damages "direct" insofar as they were caused by JetPay's failure to perform in a "commercially reasonable" manner under Section 6.3. Nor does Section 8.12 generate any ambiguity as to Section 6.4's clear exclusion of consequential damages, which in this case, include BCC's lost profits for JetPay's breach of Section 6.3. On the contrary, these references in the MSA to BCC's merchant accounts merely demonstrate that the parties were well aware of the possibility that JetPay's inadequate performance could have consequential effects on BCC's business, and yet decided to agree, in clear and conspicuous terms, that neither party shall be liable to the other for consequential damages arising from the MSA's breach. Under Texas law, the Court must honor such a clear expression of the parties' intent, and hold that the consequential damages sought in this case are barred as a matter of law. *See Frost Nat. Bank v. L & F Distributors, Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) ("If, after the pertinent rules of construction are applied, the contract can be

given a definite or certain legal meaning, it is unambiguous and we construe it as a matter of law.").

In conclusion, BCC has established genuine factual disputes regarding JetPay's breach of the MSA and the direct damages BCC suffered as a result of this breach. Therefore, summary judgment is not appropriate for this claim to the extent BCC seeks recovery of losses directly caused by JetPay's breach of the MSA. But since Section 6.4 of the MSA unambiguously bars BCC from seeking consequential damages arising from JetPay's breach, the Court concludes that Defendants are entitled to summary judgment on BCC's breach of contract claim insofar as BCC seeks recovery of consequential damages, which the Court found includes BCC's lost profits and remediation costs.

## V.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Merrick's Motion for Summary Judgment (doc. 183) and **DISMISSES** BCC's breach of contract claim for failure to prosecute in the name of the real party in interest. In light of this ruling, the Court also **FINDS MOOT** Merrick's Motion to Strike Jury Demand (doc. 234).

In addition, the Court **GRANTS IN PART** and **DENIES IN PART** JetPay's and Voigt's Motion for Summary Judgment (doc. 180).[31] For reasons discussed above, the Court finds no genuine dispute of material fact and, therefore, that judgment as a matter of law in favor of JetPay and Voigt is warranted with respect to BCC's common law fraud, fraud by nondisclosure, negligent misrepresentations, and Texas Deceptive Trade Practices Act claims, all of which are hereby **DISMISSED**. The Court also finds judgment as a matter of law in favor of JetPay and Voigt

---

[31] Also discussed above, the Court **DENIES** and **OVERRULES** JetPay's and Voigt's Objections and Motions to Strike Plaintiff's Exhibits (doc. 222).

warranted with respect to BCC's breach of contract claim, which is hereby **DISMISSED IN PART**, to the extent BCC seeks recovery of consequential damages for JetPay's breach, including BCC's lost profits and remediation costs. However, the Court concludes that genuine factual disputes remain, and that summary judgment is inappropriate, with respect to BCC's breach of contract claim against JetPay insofar as BCC seeks recovery of damages directly caused by JetPay's breach.

SO ORDERED.

DATED: September 8, 2015

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE